13-2657-cv
NASDAQ OMX Grp., Inc. v. UBS Sec., LLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: June 17, 2014     Decided: October 31, 2014)

Docket No. 13-2657-cv

THE NASDAQ OMX GROUP, INC. AND THE NASDAQ STOCK MARKET LLC,

*Plaintiffs-Appellees*,

—v.—

UBS SECURITIES, LLC,

*Defendant-Appellant*.[*]

Before:

LEVAL, STRAUB, AND RAGGI, *Circuit Judges*.

On appeal from a preliminary injunction entered in the Southern District of New York (Sweet, *J.*), barring appellant from compelling appellees' participation in arbitration pertaining to how it conducted the Facebook IPO,

[*] The Clerk of Court is directed to amend the official caption as shown above.

1

appellant challenges the district court's (1) exercise of federal question jurisdiction, (2) determination that arbitrability is a question for the court rather than an arbitrator, and (3) conclusion that appellant's underlying claims are not arbitrable.

AFFIRMED.

Judge STRAUB dissents in a separate opinion.

STEPHEN J. KASTENBERG (Paul Lantieri, III, William A. Slaughter, *on the brief*), Ballard Spahr LLP, Philadelphia, Pennsylvania, *for Plaintiffs-Appellees*.

CHARLES E. DAVIDOW (Leslie Gordon Fagen, Daniel J. Toal, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C., *for Defendant-Appellant*.

REENA RAGGI, *Circuit Judge*:

On May 18, 2012, plaintiffs, the NASDAQ OMX Group, Inc. and the NASDAQ Stock Market LLC (collectively "NASDAQ"), conducted the initial public offering ("IPO") for Facebook, Inc. The IPO was one of the largest in history, with 421 million shares of Facebook common stock offered at $38 per share, for a total value of over $16 billion. In conducting the offering, NASDAQ encountered and addressed various problems, prompting a number of

2

subsequent actions, including disciplinary proceedings by the Securities and Exchange Commission ("SEC"), see Order Instituting Admin. & Cease-and-Desist Proceeding, SEC Release No. 34-69655, 2013 WL 2326683, at *2–3 (May 29, 2013) ("SEC Release No. 34-69655"), and SEC-approved changes to NASDAQ rules. Among the latter is a new rule subsection establishing a voluntary procedure for NASDAQ members injured in the Facebook IPO to seek compensation. See Order Granting Approval of a Proposed Rule Change To Amend Rule 4626—Limitation of Liability, SEC Release No. 34-69216, 78 Fed. Reg. 19,040, 19,041 (Mar. 22, 2013) ("SEC Release No. 34-69216"). Defendant UBS Securities, LLC ("UBS") chose not to pursue that avenue for relief, instead initiating an arbitration proceeding against NASDAQ seeking indemnification for injuries sustained in the Facebook IPO, as well as damages for breach of contract, breach of an implied duty of good faith and fair dealing, and gross negligence.

NASDAQ initiated this declaratory judgment action to preclude UBS from pursuing arbitration. UBS now appeals from a preliminary injunction to that effect, entered on June 28, 2013, in the United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*). See NASDAQ OMX

Grp., Inc. v. UBS Sec. LLC, 957 F. Supp. 2d 388 (S.D.N.Y. 2013). In seeking vacatur of the injunction, UBS contends that the district court erred in (1) exercising federal question jurisdiction in a case presenting only state law claims; (2) determining that the arbitrability of UBS's claims is a question for decision by the court, rather than an arbitrator; and (3) concluding that UBS's claims are not subject to arbitration. For the reasons set forth in this opinion, we identify no error in these rulings and, therefore, affirm the challenged preliminary injunction. Our colleague, Judge Straub, dissents from the ruling as to federal jurisdiction and, thus, does not reach the other two issues.

I.     **Background**

A.     The Facebook IPO

NASDAQ is a publicly-traded, self-regulatory organization ("SRO") registered as a national securities exchange under Section 6 of the Securities Exchange Act of 1934 ("Exchange Act"). See 15 U.S.C. § 78f. It operates "one of the largest national securities exchanges," executing "approximately 15% of U.S. equity securities transactions every day." SEC Release No. 34-69655, 2013 WL 2326683, at *1. UBS is a registered broker-dealer and investment adviser, as well as a member of the NASDAQ exchange.

On May 18, 2012, NASDAQ was scheduled to conduct the highly-anticipated Facebook IPO. The initial Eastern Standard start time of 11:00 a.m. was delayed approximately one half hour, largely due to technical difficulties that NASDAQ encountered with the IPO "Cross," the computerized system that typically launches IPO trading by matching buy and sell orders to determine the opening price. See id. at *2, *5–6. At 11:30:09 a.m., NASDAQ switched to a backup "failover" system that completed the IPO Cross, whereupon "[c]ontinuous trading in Facebook shares then commenced on NASDAQ and other exchanges." Id. at *7.

The delayed start in trading had certain adverse effects, two of particular relevance here. First, over 30,000 orders entered between 11:11:00 a.m. and 11:30:09 a.m. were not included in the completed IPO Cross. See id. at *10. These orders were dealt with in various ways, including some being cancelled by NASDAQ and others being released into the market at 1:50 p.m. See id. Second, certain trade confirmation messages for orders placed before 11:30:09 a.m. were not transmitted, as a result of which some "NASDAQ members . . . were not able to determine whether their orders had been included in the cross and, therefore did not know what position they held in Facebook securities." Id. at *8. Despite

suggestions that it halt trading in the Facebook IPO, NASDAQ did not do so. See id. at *9.[1]

## B.    NASDAQ Rules

In conducting securities trading generally, including the Facebook IPO specifically, NASDAQ operated pursuant to certain internal rules mandated by federal law. Some background as to NASDAQ's internal rules is helpful to our discussion of issues raised on this appeal.[2]

### 1.    Exchange Act Mandates with Respect to Internal Rules

In order to register as an exchange, federal law requires an SRO such as NASDAQ to demonstrate to the SEC that its internal operating rules satisfy the requirements of the Exchange Act and all federal rules and regulations thereunder. See 15 U.S.C. § 78s(b)(2)(C). The Exchange Act specifically requires that a registered exchange's rules be designed

---

[1] The systems error in launching the Facebook IPO also caused other problems not directly relevant to this appeal, e.g., (a) NASDAQ inadvertently assumed an "error position in Facebook . . . massively greater than NASDAQ had envisioned," SEC Release No. 34-69655, 2013 WL 2326683, at *10; and (b) the technical difficulties that plagued the Facebook IPO Cross affected non-Facebook stock that NASDAQ had chosen to halt because "halt crosses" used the same applications, id. at *11.

[2]    NASDAQ    Rules    are    available    at    the    following    website: http://nasdaq.cchwallstreet.com/.

to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, <u>to remove impediments to and perfect the mechanism of a free and open market and a national market system</u>, and, in general, to protect investors and the public interest.

<u>Id.</u> § 78f(b)(5) (emphasis added).  The highlighted requirement is of particular significance to this case.

With certain exceptions not relevant here, an exchange must secure SEC approval for every proposed rule or rule change according to a detailed statutory procedure that provides for public notice and comment, possible hearings, and agency findings.  <u>See</u> <u>id.</u> § 78s(b), 17 C.F.R. § 240.19b-4.  The Exchange Act also provides for the SEC itself to "abrogate, add to, or delete from" an exchange's rules in specified circumstances.  <u>See</u> 15 U.S.C. § 78s(c).

The Act makes an exchange's compliance with its own rules a requirement of federal law, <u>see</u> <u>id.</u> § 78s(g)(1), and rule violations can result in SEC revocation of an SRO's registration, censure, or other sanctions, <u>see</u> <u>id.</u> § 78s(h)(1).  The Act further requires an exchange to enforce its members' compliance with the Exchange Act, SEC regulations, and the exchange's internal rules.  <u>See</u> <u>id.</u>

7

§ 78f(b)(1). Moreover, it precludes parties from contracting around, or otherwise waiving compliance with, SEC-approved exchange rules. See id. § 78cc(a).

> ### 2. SEC Sanctions NASDAQ for Rules Violations in Connection with the Facebook IPO

The SEC conducted an investigation into NASDAQ's handling of the Facebook IPO, which resulted in the agency sanctioning NASDAQ for violating the Exchange Act by not complying with its own SEC-approved rules. Notably, the SEC found NASDAQ not to have complied with NASDAQ Rule 4120(c)(7), which mandates that trading commence immediately after an IPO "display only period" and limits extension of the display period to specified circumstances found not to have been present in the Facebook IPO. See SEC Release No. 34-69655, 2013 WL 2326683, at *2, *14. The SEC also found NASDAQ not to have complied with its own Rule 4757(a)(1) by failing to adhere to its specified price/time priority with respect to approximately 30,000 orders placed before completion of the Facebook IPO Cross. See id. at *2, *14–15 The SEC further identified an Exchange Act violation insofar as NASDAQ rules did not permit NASDAQ to assume an error position in its own account, an action that, in connection with the Facebook IPO, yielded NASDAQ a profit of approximately $10.8 million. See id. *14.

To address these and other concerns, NASDAQ agreed, <u>inter alia</u>, to amend Rule 4120 and to make certain technical changes to its IPO Cross system. <u>See</u> <u>id.</u> at *15. The SEC endorsed these remedial proposals but, nevertheless, sanctioned NASDAQ by, <u>inter alia</u>, censuring the exchange, ordering it to cease and desist from violating the Exchange Act's requirement that an exchange adhere to its own rules, and imposing a $10 million civil penalty. <u>See</u> <u>id.</u> at *17.

C.     The Parties' Services Agreement

NASDAQ and UBS are parties to a bilateral "Services Agreement," several sections of which are relevant here.[3]

Section 12.B of the Services Agreement, entitled "Indemnification," is the basis for UBS's underlying claim for breach of contract and indemnification. It states as follows:

> NASDAQ OMX shall be liable to, indemnify against, and hold Subscriber [i.e., UBS], its employees, directors, and other agents harmless from, any and all Claims or Losses (as those terms are defined . . . herein) imposed on, incurred by or asserted against [UBS], its employees, directors, and other agents to the extent that the Claims and Losses result . . . from acts or omissions of NASDAQ OMX, its employees, directors, agents or associated persons; or from the receipt or use of [UBS]'s Data (including representations about

---

[3] Like the parties, we refer to the latest version of the Agreement, as revised February 20, 2013, which does not differ materially from that in effect at the time of the Facebook IPO.

[UBS]'s Data) by NASDAQ OMX, its employees, directors, or agents
. . . .

A. 136. The referenced "Claims or Losses" are defined in Section 12.G of the Services Agreement as follows:

> any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments, and reasonable costs and expenses of whatever nature, whether incurred by or issued against an indemnified Party, including without limitation: (i) indirect, special, punitive, consequential, or incidental loss or damage (including, but not limited to, trading losses, loss of anticipated profits, loss by reason of shutdown in operation or increased expenses of operation, or other indirect loss or damage); and (ii) reasonable administrative costs, litigation costs, and auditors' and attorneys' fees, both in-house and outside counsel, and related disbursements.

A. 137.

UBS's demand for arbitration derives from Section 18 of the Services Agreement, entitled "Arbitration," which states in relevant part:

> A.    Except as may be provided in the NASDAQ OMX Requirements, all claims, disputes, controversies, and other matters in question between the Parties to this Agreement and the Parties' employees, directors, agents and associated persons arising out of, or relating to this Agreement, or to the breach hereof, shall be settled by final binding arbitration in accordance with this Agreement and the following procedure or such other procedures as may be mutually agreed upon by the Parties.
>
> B.    Except as otherwise provided herein or by agreement of the Parties, any arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration

Association or in accordance with such other rules and procedures as are agreed to by the Parties.

. . .

D. The arbitration proceeding shall be held in the City of New York, unless otherwise agreed by the Parties. The decision rendered through arbitration shall be final and binding upon the Parties hereto and judgment may be entered in accordance with applicable law in any court having jurisdiction thereof.

A. 139. The "NASDAQ OMX Requirements," referenced in the opening qualifying phrase of the Arbitration provision, are defined at the outset of the Services Agreement, in Section 1.A, as follows:

(i) the rules, regulations, interpretations, decisions, opinions, orders and other requirements of the Securities and Exchange Commission ("SEC"); (ii) the applicable rules, regulations, disciplinary decisions, and rule interpretations of self-regulatory organizations; (iii) NASDAQ OMX's operating procedures, specifications, requirements, and other documentation that is regulatory or technical in nature (including, but not limited to, user guides) . . . ; (iv) all other applicable laws, statutes, rules, regulations, orders, decisions, interpretations, opinions, and other requirements, whether promulgated by the United States or any other applicable jurisdiction (including in the area of intellectual property); and (v) the successors, as they may exist at the time, of the components of the NASDAQ OMX Requirements.

A. 122–23.

Further noteworthy is Section 17 of the Services Agreement, which states that "[i]n the event of any conflict between the provisions of the [Services Agreement], the Attachments, or the NASDAQ OMX Requirements, the order of

11

preference shall be the NASDAQ OMX Requirements, the Attachments, and the [Services Agreement]." A. 138.

D. Procedural History

1. UBS Demands Arbitration

On March 15, 2013, UBS filed a demand for arbitration against NASDAQ with the American Arbitration Association ("AAA"). See Demand for Arbitration and Statement of Claims ("Demand"), A. 46. The 18-page demand asserts that UBS's dispute with NASDAQ originates in the exchange's "catastrophic mismanagement" of the Facebook IPO. Demand ¶ 1, A. 46. Specifically, UBS alleges that NASDAQ "was not up to the task" of handling such a large, high demand IPO: "[i]ts systems buckled under the strain," and "proved incapable of completing the all-important 'IPO Cross.'" Id. ¶ 3, A. 47. As a result, NASDAQ not only "was forced repeatedly to delay the open of trading in Facebook stock," but also decided to "conceal[] from the market why it was doing so," and that it was switching to a "risky and untested" alternative system, thereby preventing customers from evaluating how that system might affect their own. Id. ¶¶ 4–5, A. 47. Moreover, because the alternative system impaired NASDAQ's ability to confirm executed trades, market participants

12

were left "in the dark for more than two hours" as to the state of tens of thousands of trades, so that "[c]haos and mass confusion ensued throughout the market." Id. ¶¶ 7, 28, 32–33, A. 47–48, 53.

Based on these allegations, UBS charges NASDAQ with "violat[ing]" its "primary obligation to the investing public and to entities such as UBS": "to operate a fair and orderly market." Id. ¶ 37, A. 55. UBS asserts that how NASDAQ should have "responsibly" met this obligation was "by delaying or halting trading." Id. ¶ 38, A. 55.

UBS also alleges that it was "grossly negligent" for NASDAQ to "depart[] from proven software" in conducting such a large IPO and to continue trading with "new and inadequately tested solutions," without advising market participants of "what was happening or what actions it was taking so they could evaluate the potential consequences for themselves, their systems and take appropriate action in response." Id. ¶ 36, A. 54–55.

As to its own injuries, UBS asserts that NASDAQ's failure to provide prompt execution records prevented UBS's own computers from confirming what orders had been executed, resulting in UBS's placement of duplicate orders or its acceptance of cancellations for purchases that had, in fact, been made. See

13

id. ¶¶ 44–48, A. 57. "As a result, UBS unintentionally amassed a net long position of approximately 40.2 million Facebook shares by the end of the trading day," and ultimately incurred losses "in excess of $350 million." Id. ¶¶ 8, 50, A. 48, 58.

UBS seeks to recover these losses from NASDAQ based on (1) the indemnification provision of the parties' Services Agreement, (2) NASDAQ's breach of contract in refusing UBS's indemnification demand, (3) NASDAQ's breach of the Services Agreement's implied covenant of good faith and fair dealing in failing to declare certain UBS transactions clearly erroneous under NASDAQ Rule 11890, and (4) NASDAQ's gross negligence in using insufficiently tested and inadequate systems to conduct the Facebook IPO. See id. ¶¶ 52–76, A. 58–62.

### 2. NASDAQ's Declaratory Judgment Action

In lieu of an answer to UBS's demand for arbitration, on April 4, 2013, NASDAQ filed this action in the Southern District of New York seeking declaratory and injunctive relief. On April 16, NASDAQ moved preliminarily to enjoin UBS from proceeding with arbitration. UBS promptly cross-moved to dismiss NASDAQ's complaint and opposed the preliminary injunction motion.

On June 18, 2013, the district court granted NASDAQ's motion for a preliminary injunction and denied UBS's cross-motion to dismiss.  See NASDAQ OMX Grp., Inc. v. UBS Sec. LLC, 957 F. Supp. 2d at 407.  UBS timely filed this appeal.

II.    **Discussion**

Title 28 U.S.C. § 1292(a)(1) affords appellate jurisdiction to review the grant of a preliminary injunction. Our standard of review is "abuse of discretion," which we will identify only when the grant of equitable relief (1) "rests on an error of law or a clearly erroneous factual finding," or (2) otherwise "cannot be located within the range of permissible decisions." Evergreen Ass'n v. City of New York, 740 F.3d 233, 242 (2d Cir. 2014) (internal quotation marks and citations omitted).  UBS urges us to identify abuse of discretion here based on the district court's purported legal errors in (1) exercising jurisdiction in a case raising only state law claims between non-diverse parties, (2) deciding the arbitrability of UBS's claims itself rather than leaving that issue to an arbitrator, and (3) concluding that UBS's claims are not arbitrable.  We are not persuaded for reasons we discuss in turn.

A.  Subject Matter Jurisdiction

1.  Federal Jurisdiction Over State Law Claims

We review a district court's challenged determination of subject matter jurisdiction de novo.  See Cutrone v. Mortg. Elec. Registration Sys., Inc., 749 F.3d 137, 142 (2d Cir. 2014).  In doing so, we are mindful of the "'fundamental precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009) (quoting Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978)).  Where, as here, there is no diversity of citizenship between the parties, we look to whether the case "aris[es] under the Constitution, laws, or treaties of the United States" to determine whether federal jurisdiction is properly exercised.  28 U.S.C. § 1331; see Fracasse v. People's United Bank, 747 F.3d 141, 143–44 (2d Cir. 2014).

"It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987).  Nevertheless, in a declaratory judgment action such as this one, which seeks a ruling establishing

16

plaintiff's nonliability on the defendant's claim (for arbitration), "a complaint . . . is to be tested, for purposes of the well-pleaded complaint rule, as if the party whose adverse action the declaratory judgment plaintiff apprehends had initiated a lawsuit against the declaratory judgment plaintiff." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 68 (2d Cir. 2012) (internal quotation marks omitted). Under this "conceptual[ ] realign[ment]," we analyze the parties' claims "as they would appear in a coercive suit." Id. at 67. Accordingly, here, we must look to UBS's underlying demand for arbitration to determine the nature of the claims at issue.

UBS's demand does not assert any claims created by federal law so as to admit federal jurisdiction most directly on the principle articulated by Justice Holmes in American Well Works Co. v. Layne & Bowler Co., that "[a] suit arises under the law that creates the cause of action." 241 U.S. 257, 260 (1916); see Gunn v. Minton, 133 S. Ct. 1059, 1064 (2013) (noting that case "[m]ost directly . . . arises under federal law when federal law creates the cause of action asserted," a "rule of inclusion" that "accounts for the vast bulk of suits that arise under federal law" and "admits of only extremely rare exceptions"). Rather, UBS seeks to arbitrate claims—for breach of contract, indemnification, breach of implied

17

duties of good faith and fair dealing, and gross negligence—created by New York State law. This, however, does not necessarily preclude the exercise of federal jurisdiction.

As we have frequently observed, "[t]he artful-pleading doctrine, [a] corollary to the well-pleaded complaint rule, prevents a plaintiff from avoiding [federal jurisdiction] by framing in terms of state law a complaint the real nature of [which] is federal, . . . or by omitting to plead necessary federal questions in a complaint." Marcus v. AT&T Corp., 138 F.3d 46, 55 (2d Cir. 1998) (internal quotation marks omitted); accord Romano v. Kazacos, 609 F.3d 512, 518–19 (2d Cir. 2010). Moreover, even in the absence of artful pleading, federal jurisdiction may properly be exercised over a "special and small" category of actual state claims that present significant, disputed issues of federal law. Gunn v. Minton, 133 S. Ct. at 1064. At issue in this case is whether UBS's state law claims fall within this special and small category so as to admit federal question jurisdiction.

The category, which dates back "nearly 100 years" in Supreme Court precedent, is rooted in "the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on

18

substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005) (citing Hopkins v. Walker, 244 U.S. 486, 490–91 (1917), and "classic example" of Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 201 (1921)).  Still, the Supreme Court has been sparing in recognizing state law claims fitting this criterion.  See R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and The Federal System ("Hart & Wechsler") 799 (6th ed. 2009) (observing that Court has explicitly upheld federal jurisdiction in absence of federal cause of action only four times, citing Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314–16, and City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 164 (1997), in addition to Smith and Hopkins).  Indeed, delineating the parameters of federal jurisdiction in such circumstances has presented a constant challenge.  See Gunn v. Minton, 133 S. Ct. at 1065 (describing Supreme Court's efforts to bring order to "this unruly doctrine"); Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 809–10 (1986) (referencing "'litigation-provoking problem'" created by "presence of a federal issue in a state-created cause of action" (quoting Textile Workers v. Lincoln Mills,

353 U.S. 448, 470 (1957) (Frankfurter, J., dissenting)). This, in turn, has engendered persistent skepticism as to the value of the endeavor. See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 320 (Thomas, J., concurring) (signaling openness to reconsideration of whether federal question jurisdiction should be limited to cases in which federal law creates cause of action because "[j]urisdictional rules should be clear" and "[w]hatever the virtues of the Smith standard, it is anything but clear"); Smith v. Kansas City Title & Trust Co., 255 U.S. at 214 (Holmes, J., dissenting) ("[I]t seems to me that a suit cannot be said to arise under any other law than that which creates the cause of action."); see also Hart and Wechsler 799–800 (observing that "Justice Holmes' cause of action test is simpler and clearer—and while excluding cases like Smith or Grable, it avoids the need in a much larger number of cases to engage in what can be a refined and uncertain analysis").

This background properly signals caution in identifying the narrow category of state claims over which federal jurisdiction may be exercised. It does not, however, absolve federal courts of the duty to exercise jurisdiction when they identify state claims falling within that limited sphere. To facilitate such identification, the Supreme Court has pronounced a determinative four-part test:

20

> [F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. Where all four of these requirements are met . . . jurisdiction is proper because there is a "serious federal interest in claiming the advantages thought to be inherent in a federal forum," which can be vindicated without disrupting Congress's intended division of labor between state and federal courts.

Gunn v. Minton, 133 S. Ct. at 1065 (quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313–14); accord Fracasse v. People's United Bank, 747 F.3d at 144.

Applying this Gunn-Grable test here, we conclude that the district court correctly exercised federal question jurisdiction in this case. Indeed, while that conclusion only requires us to identify federal question jurisdiction over one of UBS's state law claims, see 28 U.S.C. § 1367 (providing for supplemental jurisdiction over claims related to one giving rise to original jurisdiction); Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 13 (1983) (stating that, if either of two causes of action comes within original jurisdiction of federal courts, removal was proper as to whole case), for reasons discussed in the next section, we conclude that federal question jurisdiction applies to all four of UBS's state claims.

21

2. Applying the *Gunn-Grable* Test to UBS's Claims

a. The Presence of a Necessarily Raised and Actually Disputed Federal Issue

In determining whether UBS's four state law claims against NASDAQ raise a federal issue, we begin by considering the duty underlying each claim. It is the violation of a duty that would trigger any contract right to indemnification, or support tort claims for negligence or a failure of good faith and fair dealing in the circumstances presented. See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 177 (2d Cir. 2013) (stating that, under New York law, negligence claim depends on "the existence of a duty on defendant's part as to plaintiff" (internal citation omitted)); Havana Cent. NY2 LLC v. Lunney's Pub, Inc., 49 A.D.3d 70, 77, 852 N.Y.S.2d 32, 37 (1st Dep't 2007) (observing that "if there is no contractual obligation to perform an act, the failure to perform the act cannot be a breach of the contract" (citing Restatement (Second) of Contracts § 235(b) (1981) (defining breach of contract as "non-performance of a duty when performance is due"))); Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407–08 (2d Cir. 2006) (recognizing that implied duty of good faith and fair dealing claim requires "an obligation that may be presumed to have been intended by the parties" to the underlying contract).

22

UBS's arbitration demand makes plain that a singular duty underlies all four of its state law claims: NASDAQ's duty to operate a fair and orderly market. "An exchange is required to operate a fair and orderly market. This is its primary obligation to the investing public and to entities such as UBS. Nasdaq violated this obligation." Demand ¶ 37, A. 55.

The duty UBS identifies—indeed, the very language it employs—derives directly from federal law. In the Exchange Act, Congress makes plain that "maintenance of fair and orderly markets" is the animating goal of federal securities law. 15 U.S.C. § 78k-1(a)(1)(C). Toward this end, and as detailed in Part I.B.1., supra, the Exchange Act requires, as a specific condition of registration as a national exchange, that an SRO satisfactorily demonstrate to the SEC that its internal operating rules "remove impediments to and perfect the mechanism of a free and open market and a national market system." Id. § 78f(b)(5).[4] The Act further makes an exchange's compliance with its SEC-approved rules a mandate of federal law, see id. § 78s(g)(1), and provides for

---

[4] In its arbitration demand, UBS effectively acknowledges the federal law origin of NASDAQ's market duty when it describes NASDAQ as "a self-regulatory organization . . . within the meaning of the Securities Exchange Act of 1934 and is responsible for operating and maintaining the integrity of the Nasdaq stock market." Demand ¶ 14(a), A. 50.

23

violators to be sanctioned, see id. §§ 78u(d),(f), 78s(h)(1),(4). Thus, whether a registered securities exchange such as NASDAQ has violated its federally prescribed duty to operate a fair and orderly exchange necessarily raises a disputed question of federal law.

Moreover, that federal law question can only be answered by considering another: how NASDAQ's duty to operate a fair and orderly market—a duty sourced in the Exchange Act, amplified by SEC regulations, and implemented through SEC-approved NASDAQ rules—applies in the context of an IPO generally, and particularly with respect to the Facebook IPO. Thus, even if, as our dissenting colleague Judge Straub observes, there is no dispute here as to the existence of a federal duty, see Dissenting Op., post at [7–8], there is certainly a dispute as to the violation of that duty, particularly in causing UBS's injuries. Resolution of that dispute will require construction of a federal statute, rules promulgated pursuant to the statute's mandates, and the statute's implementation by the SEC.[5] In short, "it is the propriety of [NASDAQ's]

---

[5] We need not decide whether, as Judge Straub maintains, federal jurisdiction over state claims invariably depends on the disputed "validity or construction of a federal statute." See Dissenting Op., post at [20–21]. We note, however, that this court has concluded that federal jurisdiction over a state claim was properly exercised where the dispute required a construction of exchange rules

24

actions, as prescribed under federal law, that is at the heart of [UBS's] allegations." D'Alessio v. N.Y. Stock Exch., Inc., 258 F.3d 93, 103 (2d Cir. 2001).[6]

In reporting on its inquiry into NASDAQ's compliance with the Exchange Act in conducting the Facebook IPO, the SEC stated that "[w]hen initiating an IPO, an exchange has an obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the IPO without disruption to the market, and that it complies with all rules regarding, among other things, order price and time priority." SEC Release No. 34-69655, 2013 WL 2326683, at *1. These are the very obligations that UBS charges NASDAQ with failing to meet in violating its duty to provide a fair and orderly market for the Facebook IPO. See supra Part I.D.1 (discussing UBS Demand allegations). Thus, although UBS's claims for relief may invoke state law of contract and tort, the duty on which these claims turn—and their particular scope as it pertains to UBS

_____

implicating the exchange's statutory duty to monitor its members' compliance with federal law, the identified substantial issue. See D'Alessio v. N.Y. Stock Exch., Inc., 258 F.3d 93, 101–02 (2d Cir. 2001).

[6] As in D'Alessio, exchange rules are at issue in this case to the extent they inform the statutory duty—"to operate a fair and orderly market"—that UBS asserts NASDAQ "violated." Demand ¶ 37, A. 55.

in participating in the Facebook IPO—necessarily raises disputed issues of federal securities law.

For example, in pursuing its claim for indemnification and breach of contract for failure to indemnify (collectively "indemnification claims"), UBS submits that the parties' Services Agreement obligates NASDAQ to compensate UBS for losses sustained as a result of technical errors in conducting the Facebook IPO, including NASDAQ's failure timely and accurately to fill and confirm orders. See Demand ¶¶ 58–59, 66, A. 59–60. But the Services Agreement does not itself specify how NASDAQ was to fill and confirm orders or otherwise conduct an IPO. Those obligations are delineated in NASDAQ's own rules, notably, Rules 4120 ("Limit Up-Limit Down Plan and Trading Halts") and 4753 ("Halt and Imbalance Cross"), which prescribe how NASDAQ was to conduct an IPO Cross, to fill orders, to provide disclosures, and to make decisions regarding initiating, halting, and resuming trading. The Services Agreement incorporates NASDAQ's rules by reference, see Services Agreement § 17, A. 138, but NASDAQ's duties to promulgate those rules and then to adhere to them were dictated by federal law, see 15 U.S.C. § 78s(b)(2) (mandating exchanges to promulgate rules "consistent with the requirements of the [Exchange Act]"),

26

§ 78s(g)(1) (requiring exchange compliance with own rules). Thus, UBS's

indemnification claims are reasonably understood to seek compensation for

losses allegedly caused by NASDAQ's violation of its federal law duties to

operate fair and orderly markets and to adhere to its own SEC-approved internal

rules ensuring such operation. As such, the claims necessarily raise disputed

issues of federal law.[7]

The same conclusion obtains as to UBS's claim for breach of the implied

duty of good faith and fair dealing, insofar as NASDAQ failed to cancel certain

UBS trades placed during the Facebook IPO. Although pleaded by reference to

---

[7] The incorporation of a federal standard in a state-law private action does not necessarily trigger federal jurisdiction, but that conclusion derives not from the absence of a disputed federal law issue at the initial step of Gunn-Grable analysis but from doubt as to the substantiality of the federal issue in dispute at the next step of analysis. See Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. at 805–06, 814–16. As we explain in Part II.A.2.b, infra, Merrill Dow does not support any categorical conclusions as to substantiality, as suggested by Judge Straub, see Dissenting Op., post at **[26–27]**. Indeed, in Grable, the Supreme Court described Merrell Dow as "disclaim[ing] the adoption of any bright-line rule, as when the Court reiterated that 'in exploring the outer reaches of § 1331, determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system'" and "'careful judgments,' . . . about the 'nature of the federal interest at stake.'" Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 317 (quoting Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. at 810, 814 & n.12).

New York law, the claim is premised on NASDAQ Rule 11890. See Demand ¶¶ 68–73, A, 61–2 (repeatedly referencing Rule 11890).

Rule 11890 authorizes NASDAQ to cancel any transaction deemed clearly erroneous. A party seeking cancellation must submit a written complaint within 30 minutes of the time at which the erroneous transaction was executed. See Rule 11890(a)(2)(A)(i). Alternatively, NASDAQ, in its discretion, may consider cancellation requests received up to 60 minutes after execution of an erroneous transaction. See Rule 11890(a)(2)(A)(iii).

UBS alleges that, on the day of the Facebook IPO, it provided NASDAQ with notice of certain erroneous transactions. To the extent its request for cancellation was untimely, UBS charges that it was NASDAQ's own conduct that deprived it of the rule's benefit, thereby breaching the duty of good faith and fair dealing implicit in the Services Agreement's incorporation of Rule 11890: "By failing to inform UBS or the market of its system malfunctions in a timely manner, Nasdaq denied UBS the opportunity to provide notice of clearly erroneous trades in a manner consistent with Nasdaq Rule 11890, and thus denied it the benefit of that provision." Demand ¶ 73, A. 61.

UBS's good faith and fair dealing claim thus necessarily raises disputed questions as to NASDAQ's obligations under Rule 11890, not only generally, but in the particular circumstances where NASDAQ has allegedly violated its Exchange Act duty to provide a fair and orderly market for securities trading. Thus, this claim also necessarily presents a disputed issue of federal law.

Finally, UBS charges NASDAQ with gross negligence insofar as it employed unprecedented, untested, and inadequate systems and procedures to conduct the Facebook IPO. See Demand ¶¶ 74–76, A. 62. As earlier noted, an essential element of a negligence claim is the existence of a duty owed by defendant to plaintiff. See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d at 177. The source of the duty NASDAQ owed its members and the investing public in conducting an IPO is federal law. See D'Alessio v. N.Y. Stock Exch., Inc., 258 F.3d at 103 (observing that source of exchange's duty to monitor compliance with federal securities law and rules and regulations promulgated thereunder "is found in federal law, namely, in the Exchange Act" (emphasis in original)); SEC Release No. 34-69655, 2013 WL 2326683, at *1 (summarizing exchange's obligations under federal law when initiating an IPO). Insofar as the parties dispute whether NASDAQ breached its duty to UBS in conducting the

29

Facebook IPO, the negligence claim thus also necessarily raises disputed issues of federal law.[8]

In sum, UBS's claims against NASDAQ necessarily raise multiple disputed issues of federal law, including the contours of NASDAQ's federal duty to maintain a fair and orderly market, the scope of that duty, and whether the failure of NASDAQ's systems during the Facebook IPO amounted to a breach of that duty. Accordingly, we deem this prong of the Gunn-Grable test satisfied and we turn to the next requirement: substantiality.

b.     Substantiality

The exercise of federal jurisdiction over state law claims demands "not only a contested federal issue, but a substantial one." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313. Substantiality ensures "a serious federal interest in claiming the advantages thought to be inherent in a federal forum." Id. Consistent with this objective, "it is not enough that the federal issue be significant to the particular parties in the immediate suit"; rather,

---

[8] Although UBS suggested at oral argument that its negligence claim did not depend on federal law, the argument is defeated by the cited precedents, by UBS's specific reference in its Demand to the Exchange Act duty to operate a fair and orderly market, and by its failure to point us to any distinct state law duty applicable to NASDAQ's conduct of the Facebook IPO.

30

"substantiality . . . looks to the importance of the issue to the federal system as a whole." Gunn v. Minton, 133 S. Ct. at 1066; accord Fracasse v. People's United Bank, 747 F.3d at 144. We here conclude that the disputed federal issue in this case—whether NASDAQ violated its Exchange Act obligation to provide a fair and orderly market in conducting an IPO—is sufficiently significant to the development of a uniform body of federal securities regulation to satisfy the requirement of importance to "the federal system as a whole."[9]

In reaching this conclusion, we begin with language in the Exchange Act stating Congress's express finding that "[t]he securities markets are an important national asset which must be preserved and strengthened." 15 U.S.C. § 78k-

---

[9] Judge Straub suggests that issues "important to the federal system as a whole" must be issues of "federal jurisprudence." Dissenting Op., post at **[20]**. We note that the Supreme Court has not referenced jurisprudence—"the study of the general or fundamental elements of a particular legal system, as opposed to its practical and concrete details," Black's Law Dictionary 932 (9th ed. 2009)—in explicating Gunn-Grable analysis. The matter requires no detailed discussion here, however, because the federal law requirement that national exchanges provide fair and orderly markets is a fundamental element, and not a peripheral detail, of the federal system of securities regulation. According to the standards laid out in Gunn, this is sufficient to establish importance to the federal system as a whole. See Gunn v. Minton, 133 S. Ct. at 1067 (suggesting that "development of a uniform body of [patent] law" was of importance to the federal system as a whole (alterations in original)); see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 309 (holding that dispute over "meaning of a federal tax provision" is "important federal-law issue that belongs in federal court").

1(a)(1)(A).  The central role stock exchanges play in the national system of

securities markets is beyond question:

> Stock exchanges perform an important function in the economic life of this country.  They serve, first of all, as an indispensable mechanism through which corporate securities can be bought and sold.  To corporate enterprise such a market mechanism is a fundamental element in facilitating the successful marshaling of large aggregations of funds that would otherwise be extremely difficult of access.  To the public the exchanges are an investment channel which promises ready convertibility of stock holdings into cash.  The importance of these functions in dollar terms is vast . . . . Moreover, because trading on the exchanges, in addition to establishing the price level of listed securities, affects securities prices in general, and because such transactions are often regarded as an indicator of our national economic health, the significance of the exchanges in our economy cannot be measured only in terms of the dollar volume of trading.

Silver v. N.Y. Stock Exch., 373 U.S. 341, 349–50 (1963).  The SEC recently

reiterated this point:  "National securities exchanges . . . are critical components

of the National Market System, which provides the foundation for investor

confidence in the integrity and stability of the United States' capital markets."

SEC Release No. 34-69655, 2013 WL 2326683, at *1.  Thus, while exchanges are

self-regulatory organizations, their self-regulation is not independent.  Federal

law imposes specific preconditions to, ongoing requirements for, and oversight

of, the operations of registered exchanges in furtherance of the strong national

interest in "preserv[ing] and strengthen[ing]" the operation of national securities markets. 15 U.S.C. § 78k-1(a)(1)(A).

Even if the importance of stock exchanges and securities markets to the national economy does not necessarily render every federal question pertaining thereto sufficiently substantial to satisfy this prong of Gunn-Grable analysis, it is noteworthy here that the SEC's just-quoted statement was made, not generally, but in the specific context of assessing the very federal issue disputed in this case, namely, whether NASDAQ, in conducting one of the largest IPOs in the nation's history, had complied with mandates of the Exchange Act, including mandates that it operate a fair and orderly market and adhere to its own SEC-approved rules. This strongly signals the substantial importance of these federal issues, not simply to the parties in this action, but to the development of uniform federal securities regulation, and thus to the "federal system as a whole." Gunn v. Minton, 133 S. Ct. at 1066.[10]

_____

[10] Our dissenting colleague suggests that the fact that UBS challenges NASDAQ's market operations in the context of one of the largest IPOs in history is of no import to our substantiality analysis. See Dissenting Op., post at **[21–22]**. To the contrary, it is these circumstances that demonstrate NASDAQ's challenged actions to have reached well beyond UBS to affect every member of the NASDAQ exchange and hundreds of thousands of investors. Thus, the parties' dispute as to the parameters of NASDAQ's Exchange Act duty to provide a fair

UBS urges otherwise, citing Barbara v. New York Stock Exchange, Inc., 99

F.3d 49 (2d Cir. 1996). In there holding that a disputed issue about an exchange's

compliance with an internal rule was not sufficiently substantial to support

federal jurisdiction over state claims, this court observed that such rules are

essentially "contractual in nature, and are thus interpreted pursuant to ordinary

principles of contract law, an area in which the federal courts have no special

expertise." Id. at 54–55 (internal quotation marks omitted). UBS suggests, and

Judge Straub appears to agree, see Dissenting Op., post at **[12–13]**, that this

pronouncement categorically precludes identifying exchange rules disputes as

"substantial" federal issues. This not only overreads Barbara, but also fails to

heed Supreme Court precedent disavowing categorical assessments of federal

jurisdiction over state law claims.

As to Barbara, we first note that this court there recognized that state law

claims turning on an exchange's compliance with its internal rules do raise

disputed questions of federal law; it was at the next step of analysis that Barbara

---

and orderly market in the context of this IPO must be viewed as a federal
question important to the national system of securities regulation as a whole and,
therefore, a "substantial" federal dispute. Indeed, we explain this point further
in Part II.A.2.b, infra.

34

concluded that the particular federal questions raised in that case were insufficiently substantial, i.e., important to the federal system as a whole, to support the exercise of federal jurisdiction. See 99 F.3d at 54.

Second, the source of Barbara's observation about the contractual nature of securities rules, Merrill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis, 903 F.2d 109, 112 (2d Cir. 1990), is worth noting. In Merrill Lynch, this court had to decide which of two agreements controlled an arbitration dispute: the general arbitration provision in the American Stock Exchange's SEC-approved constitution or the parties' more specific customer agreement pertaining to arbitration. Viewing both agreements as contractual, this court concluded that federal arbitration law, see 9 U.S.C. § 2, required that the more specific customer agreement control. This case presents us with no comparable separate agreement between the parties—much less one subject to a unique statutory mandate, such as federal arbitration law—that might afford UBS rights distinct from those reflected in NASDAQ's SEC-approved rules for satisfying the fair-and-orderly market requirements of the Exchange Act.

Barbara made no mention of these circumstances in applying Merrill Lynch's analogy of exchange rules to contracts even in the absence of a statutory

conflict. Nor did it have occasion to consider or discuss the fact that, unlike most contracts between private parties, exchange rules are subject to SEC approval. This is hardly surprising given that the particular rules dispute at issue in Barbara was of trifling significance to the overall system of federal securities regulation, especially in comparison to the far more important question of whether NASDAQ breached its duty to maintain a fair and orderly market in the Facebook IPO—a point discussed further in the next paragraph.[11]   In fact, however, the ordinary principle of contract law that looks only to the intent of private contractors to construe their agreements, see Goldman v. White Plains Ctr. for Nursing Care, LLC, 11 N.Y.3d 173, 176, 867 N.Y.S.2d 27, 29 (2008), is not so simply applied to SEC-approved rules, particularly rules intended to effect the Exchange Act's prescribed duty to provide fair and orderly markets—the point

---

[11] Barbara acknowledged SEC-approval of NASDAQ rules in setting forth the case's background, see 99 F.3d at 51, but the court had no need thereafter to consider or discuss how this statutorily mandated approval process might bear on substantiality because the rules dispute at issue in Barbara was important only to the parties, not to the federal system as a whole.  Thus, the conclusion Barbara drew from Merrill Lynch's pronouncement that "the rules of a securities exchange are contractual in nature," Merrill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis, 903 F.2d at 113, i.e., that such rules "are thus interpreted pursuant to ordinary principles of contract law, an area in which the federal courts have no special expertise," Barbara v. New York Stock Exchange, Inc., 99 F.3d at 55, supports at most a general, but not a categorical, conclusion that exchange rules disputes do not raise substantial federal questions.

36

at issue here. While NASDAQ and UBS here incorporated NASDAQ rules into their own Services Agreement, federal law did not permit them to do otherwise or to agree on a different rule construction within the Services Agreement than that recognized by the SEC. See 15 U.S.C. § 78cc(a) (precluding parties from contracting around SEC-approved exchange rules); Services Agreement § 17, A. 138 (providing that NASDAQ OMX Requirements, which include all SEC-approved NASDAQ rules, shall have preference over any conflicting Agreement provisions). Thus, Exchange Act mandates for NASDAQ's rules, the SEC's particular role in approving NASDAQ's rules, its authority itself to change those rules, its responsibility for overseeing NASDAQ's compliance with the rules, and its power to discipline NASDAQ for rules violations—as it did with respect to the Facebook IPO here at issue—all indicate that NASDAQ rules are part of a more complex scheme (implicating greater federal interests) than that presented by most private party agreements, even those that borrow federal standards to resolve state law contract claims. See D'Alessio v. N.Y. Stock Exch., Inc., 258 F.3d at 104 ("The comprehensive scheme of statutes and regulations designed to police the securities industry is indicative of a strong federal interest." (internal quotation marks omitted)). Accordingly, the contractual nature of Exchange Act-

37

mandated exchange rules does not, by itself, mean that <u>all</u> rule disputes raise insubstantial questions of federal law. Rather, substantiality depends on a careful assessment of how the rule dispute affects the federal system as a whole. <u>See generally</u> <u>Fracasse v. People's United Bank</u>, 747 F.3d at 144–45 (concluding that disputed issue under Fair Labor Standards Act was insubstantial where plaintiffs referenced federal law for "public policy considerations" and not as basis for their claims).

This brings us to our third, and most important point in distinguishing this case from <u>Barbara</u>: the context of the rules disputes in these two cases. The dispute in <u>Barbara</u> pertained to an exchange's action, allegedly in violation of the exchange's rules, in provisionally barring a floor clerk from the trading floor while disciplinary proceedings were pending against him, and then in refusing to lift the ban even after all disciplinary charges against the clerk were dismissed. <u>See</u> <u>Barbara v. N.Y. Stock Exch., Inc.</u>, 99 F.3d at 51–52.

Without belittling the importance of either the maintenance of discipline among marketplace personnel, or of an exchange's adherence to its disciplinary rules, the parties' dispute in <u>Barbara</u> did not implicate one of "the most fundamental functions of a national securities exchange." SEC Release No. 34-

38

69655, 2013 WL 2326683, at *1. In contrast, UBS's claims here, whether sounding in contract or in tort, charge NASDAQ with violating the core duty of a federally registered SRO under the Exchange Act: to provide a fair and orderly market for a public stock offering. The SEC emphasized the importance of that duty to the overall system of federal securities regulation when it observed in connection with NASDAQ's conduct of the Facebook IPO, "[t]he orderly initiation of secondary market trading after an IPO is one of the most fundamental functions of a national securities exchange, and affects not only the market for those individual companies but also investor confidence in the market as a whole." SEC Release No. 34-69655, 2013 WL 2326683, at *1. Indeed, there can be no doubt as to that conclusion given that NASDAQ's alleged failure to provide a fair and orderly market was in the context of one of the largest public stock of offerings in history—involving 421 million shares valued at $16 billion. In short, UBS does not charge NASDAQ with violating its Exchange Act duty to provide a fair and orderly market for a small or discrete number of securities transactions; rather it charges a massive failure of NASDAQ's systems. Thus, the federal question

raised by UBS's claims as to NASDAQ's performance of its critical, federally mandated duty cannot be deemed less than substantial.[12]

That conclusion is reinforced by the fact that the particular NASDAQ actions faulted by UBS—in starting and stopping trading, cancelling trades, and informing the public of its actions—implicate exchange powers that have been deemed "quasi-governmental." DL Capital Grp., LLC v. Nasdaq Stock Mkt., 409 F.3d 93, 98 (2d Cir. 2005) (listing among such powers "Nasdaq's regulatory decisions to suspend trading, resume trading, or cancel trades" and noting that even choice of when and how to announce those decisions was "consistent with Nasdaq's quasi-governmental powers as an SRO" (emphasis in original) (internal quotation marks and brackets omitted). To be sure, this does not equate this case to those presenting disputes as to the validity of actual governmental action. See

---

[12] Our dissenting colleague downplays the pervasive effects on the national securities markets of NASDAQ's alleged failures in conducting the Facebook IPO on the ground that substantiality means not "large" or "significant" but only "important to federal jurisprudence." See Dissenting Op., post, at **[21–22]**. We have already explained why a dispute about the scope of an exchange's duty to operate a fair and orderly market is fundamental to the development of a uniform body of federal securities regulation and, thus, important to the federal system as a whole. See supra note 9 and accompanying text. The fact that UBS charges NASDAQ with a failure of that duty in connection with such a large public offering only confirms that the question here is important "to the federal system as a whole," the standard for substantiality set forth in Gunn v. Minton, 133 S. Ct. at 1066.

Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 315–16 (approving exercise of federal jurisdiction over state claims where validity of IRS action was central to dispute); Smith v. Kansas City Title & Trust Co., 255 U.S. at 201 (identifying federal jurisdiction over state law claim that required decision on constitutional validity of federal bond issuance). Nevertheless, where, as here, UBS's state law claims already present a substantial dispute of federal law insofar as they charge NASDAQ with violating its Exchange Act duty to provide a fair and orderly market for the Facebook IPO, the fact that UBS attributes that violation to NASDAQ's malfeasance in performing quasi-governmental powers conferred on it by the Exchange Act reinforces our substantiality conclusion.

Further, characteristics that in some cases have signaled against substantiality—e.g., the retrospective nature of a claim, the propriety of resolving the federal dispute in a state forum, and the absence of a federal remedy—do not support that conclusion here. See Gunn v. Minton, 133 S. Ct. at 1066–67 (referencing retrospective nature of claim and state's ability to resolve dispute at issue without threatening uniformity of federal law as factors that might signal lack of substantiality); Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. at 814 (construing Congress's decision not to provide federal remedy for violation of

41

federal law as tantamount to conclusion that presence of claimed violation in state cause of action is insufficiently substantial to confer federal question jurisdiction). To the contrary, resolution of the disputed federal law issue here would likely have far-reaching prospective consequences for the operation of national securities exchanges, particularly in conducting IPOs. Further, as discussed in the next section addressing the federal-state balance prong of the Gunn-Grable test, see infra Part II.A.3, Congress has attempted to place disputes alleging violations of federal securities law obligations exclusively in a federal forum. Finally, since Merrell Dow Pharmaceuticals Inc. v. Thompson, the Supreme Court has clarified that the absence of a federal cause of action is a factor relevant to, but not dispositive of, the question of whether a federal law dispute raised by a state law claim can properly be deemed substantial. See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 310, 318.

In short, UBS cannot urge that Barbara or any other case establishes a categorical rule for assessing substantiality because the Supreme Court has ruled that the concept is not susceptible to bright-line analysis. Rather, substantiality must be determined based on a careful, case-by-case judgment. See id. at 317–18; see also Gully v. First Nat'l Bank in Meridian, 299 U.S. 109, 117–18 (1936)

42

(Cardozo, J.) (observing that substantiality assessment requires "something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation"); accord Greenblatt v. Delta Plumbing & Heating Corp., 68 F.3d 561, 570 (2d Cir. 1996) (referencing need for court to make "principled, pragmatic distinctions" in assessing substantiality (internal quotations omitted)).

Because the category of cases admitting federal jurisdiction over state law claims is "special and small," Gunn v. Minton, 133 S. Ct. at 1064, it is to be expected that, after such careful, case-specific consideration, most federal law questions raised in connection with state law claims will not be deemed substantial, see id. at 1064–65; Greenblatt v. Delta Plumbing & Heating Corp., 68 F.3d at 570–71; Gully v. First Nat'l Bank in Meridian, 299 U.S. at 118. But the federal law dispute in this case—whether NASDAQ violated its duty to provide a fair and orderly market for the Facebook IPO—is of a different sort.[13]

---

[13] Judge Straub predicts that exercising federal jurisdiction here will lead to a "horde" of increased litigation, trying to sweep into federal court every state law claim that turns on the interpretation of a stock exchange rule, including countless arbitration proceedings before the Financial Industry Regulatory Authority ("FINRA"). See Dissenting Op, post Part III.B. This concern is unwarranted. Few, if any, such cases are likely to present issues of such importance to the federal system of securities regulation as the alleged wholesale

As already explained, that duty is not simply coincidental to UBS's state law claims; it is the duty on which the claims rest. Thus, this case is not at all akin to Gunn in which the Supreme Court ruled that a federal patent law question arising in the context of a state malpractice action was not sufficiently substantial to support federal jurisdiction over the malpractice action. See 133 S. Ct. at 1066–68. Not only was the patent question in Gunn derivative rather than direct; it was also merely "hypothetical" because of the backward looking nature of the claim. See id. at 1066 (noting that state court would, at most, consider what would have happened in prior federal proceeding if argument had been made). There is nothing indirect or hypothetical in UBS's claim that NASDAQ failed in its "primary" duty to provide a fair and orderly market for the Facebook IPO. Moreover, the strong federal interest in an exchange's performance of that duty is evident from the Exchange Act's specific identification of fair and orderly markets as an animating object of that legislation, see 15 U.S.C. § 78k-1(a)(1)(C), and from its provision conditioning national exchange registration on a demonstration of (and subsequent compliance with) internal rules that promote fair and orderly markets, see id. §§ 78s(g)(1), 78u(d) (f), 78s(h)(1) (4); see also

---

failure charged here of a stock exchange's Exchange Act duty to provide a fair and orderly market for a major IPO.

D'Alessio v. N.Y. Stock Exch., Inc., 258 F.3d at 100 (stating that issues requiring interpretation and application of federal securities laws and related statutory and regulatory requirements are "areas of undisputed strong federal interest"); Friedlander v. Troutman, Sanders, Lockerman & Ashmore, 788 F.2d 1500, 1504 (11th Cir. 1986) ("The comprehensive scheme of statutes and regulations designed to police the securities industry is indicative of a strong federal interest.").  The SEC has recognized that the need for fair and orderly markets is greatest when a stock offering is being made to the investing public.  NASDAQ's alleged violation of its duty to provide a fair and orderly market arises in just that context, indeed, in connection with one of the largest public offerings of securities in the nation's history.  Such circumstances compel the conclusion that UBS's state law claims raise substantial, disputed federal issues—issues important to the federal system as a whole.

### 3.    Federal-State Balance

The final Gunn-Grable factor "is concerned with the appropriate 'balance of federal and state judicial responsibilities.'" Gunn v. Minton, 133 S. Ct. at 1068 (quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314).   Here, this factor strongly supports federal jurisdiction.   Far from

threatening the federal-state balance envisioned by Congress in this area, the exercise of federal jurisdiction here comports with Congress's expressed preference for alleged violations of the Exchange Act, and of rules and regulations promulgated thereunder, to be litigated in a federal forum. See 15 U.S.C. § 78aa(a) (providing federal courts with "exclusive jurisdiction of violations of [Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [Exchange Act] or the rules and regulations thereunder").

Indeed, among our sister circuits, the Fifth and Ninth have concluded that certain disputes involving state law claims against SROs confer <u>exclusive</u> federal jurisdiction under § 78aa. <u>See</u> <u>Sacks v. Dietrich</u>, 663 F.3d 1065, 1068–69 (9th Cir. 2011) (concluding that, though plaintiff pleaded only state law causes of action and did not name as defendant SRO or SRO employees, "liability turns on interpretation of rules that are approved by the SEC and whose violations are subject to exclusive federal jurisdiction," citing § 78aa); <u>Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.</u>, 159 F.3d 1209, 1211–12 (9th Cir. 1998) (holding that "although [plaintiff's] theories are posited as state law claims, they are founded on the defendants' conduct in suspending trading and de-listing the

offering, the propriety of which must be exclusively determined by federal law" and therefore § 78aa provided for exclusive jurisdiction in federal court); Hawkins v. Nat'l Ass'n of Sec. Dealers, Inc., 149 F.3d 330, 331–32 (5th Cir. 1998) (concluding that plaintiff's claims against SRO of breach of duty, conspiracy to deny relief, and failure to supervise, "though carefully articulated in terms of state law, are actions at law seeking to enforce liabilities or duties created by federal securities laws which are governed exclusively by federal courts pursuant to 15 U.S.C. § 78aa").

In Barbara, we declined to adopt such a broad reading of § 78aa. See 99 F.3d at 55 (holding that federal jurisdiction over state claims could not be premised on § 78aa because that statute refers to claims created by the Exchange Act and rules promulgated thereunder, not to claims created by state law). See also Karsner v. Lothian, 532 F.3d 876, 887–88 (D.C. Cir. 2008) (concluding that SEC approval of National Association of Securities Dealers ("NASD") rules did not bring all rules questions within § 78aa grant of exclusive federal jurisdiction); Ford v. Hamilton Investments, Inc., 29 F.3d 255, 258–59 (6th Cir. 1994) (holding that dispute about arbitration compliance with NASD rules did not give rise to federal question jurisdiction based on SEC approval of rules, particularly where

claim did not allege violation of securities laws or seek to enforce any duty created by such laws). We need not revisit that conclusion here. At this step of the Gunn-Grable test—which post-dates Barbara—it suffices for us to identify the jurisdiction grant of § 78aa as a signal that we will not upset the appropriate balance of federal and state judicial responsibilities by exercising federal jurisdiction in this case, where state claims necessarily raise a disputed issue about NASDAQ's compliance with its Exchange Act duty to have provided a fair and orderly market for the Facebook IPO. See D'Alessio v. N.Y. Stock Exch., Inc., 258 F.3d at 104 (noting that exclusive jurisdiction grant of § 78aa signals recognition of strong federal interest in regulation of securities industry and exchanges). Indeed, that conclusion is only reinforced where, as here, a party's efforts to have that federal law duty assessed by reference to state law principles—e.g., good faith, fair dealing, negligence—could undermine Congress's expectations for uniformity in an exchange's performance of specified Exchange Act duties. Cf. Gunn v. Minton 133 S. Ct. at 1067 (observing that state court's hypothetical assessment of how patent issue might have been resolved in prior federal proceeding did not upset federal-state balance favoring uniform

48

body of patent law because it would result neither in a binding ruling of federal law nor a conflicting ruling of state law).

In sum, upon conducting the analysis prescribed by Gunn-Grable, we conclude that UBS's state claims against NASDAQ necessarily raise disputed issues of federal law of significant interest to the federal system as a whole, and that the adjudication of state claims presenting such disputes in the federal courts would not disrupt any federal-state balance envisioned by Congress. See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314–15. Accordingly, we conclude that the district court correctly exercised federal jurisdiction here.

B.    Arbitrability

1.    Who Decides Arbitrability

UBS contends that, even if the district court properly exercised jurisdiction in this case, it erred in concluding that it, rather than an arbitrator, should decide whether UBS's claims are subject to arbitration. See NASDAQ OMX Grp., Inc. v. UBS Sec. LLC, 957 F. Supp. 2d at 403–05.  We review this issue de novo, see Contec v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005), and we conclude

that the district court correctly identified arbitrability as a question for the court to decide in this case.

The law generally treats arbitrability as an issue for judicial determination "unless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (internal quotation marks and brackets omitted); accord VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P., 717 F.3d 322, 325–26 (2d Cir. 2013). UBS and NASDAQ made no such alternative provision here. Rather, their Services Agreement is silent as to who should decide arbitrability.

We have found the "clear and unmistakable" provision satisfied where a broad arbitration clause expressly commits all disputes to arbitration, concluding that all disputes necessarily includes disputes as to arbitrability. See PayneWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996). But we have not reached the same conclusion where a broad arbitration clause is subject to a qualifying provision that at least arguably covers the present dispute. See Katz v. Feinberg, 290 F.3d 95, 97 (2d Cir. 2002). In such circumstances, we have identified ambiguity as to the parties' intent to have questions of arbitrability—which would include whether a dispute falls within or outside the scope of the

50

qualifier—decided by an arbitrator. See id. Here, the broad arbitration clause in the parties' Services Agreement is subject to qualification: "Except as may be provided in the NASDAQ OMX Requirements, all claims, disputes, controversies and other matters in question between the Parties to this Agreement . . . shall be settled by final and binding arbitration." Services Agreement, § 18.A, A. 139 (emphasis added). As explained in the next section of this opinion, one of the provisions of the NASDAQ OMX Requirements at least arguably immunizes NASDAQ from liability for the type of claim asserted by UBS, making it far from "clear and unmistakable" that the Services Agreement provides UBS with an arbitrable claim. Thus, we cannot conclude that UBS and NASDAQ clearly and unmistakably committed questions of arbitrability to an arbitrator rather than the court.

In urging otherwise, UBS submits that the Services Agreement's quoted carve-out provision is irrelevant because NASDAQ never adopted the referenced limiting requirements. This misapprehends the relevant standard. The Services Agreement need not clearly remove the question of arbitrability from arbitration in order for that question to be one for judicial determination. Rather, UBS must point to a clear and unmistakable expression of the parties' intent to submit

arbitrability disputes to arbitration.  See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. at 83.  UBS cannot carry that burden by pointing to a broad arbitration clause that the parties subjected to a carve-out provision.

UBS nevertheless maintains that any ambiguity as to the parties' intent respecting resolution of questions of arbitrability is eliminated by the Services Agreement's incorporation of AAA rules, which provide for arbitrability to be decided by the arbitrator.  See Services Agreement, § 18.B, A. 139 ("Except as otherwise provided herein or by agreement of the Parties, any arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association or in accordance with such other rules and procedures as are agreed to by the parties."); AAA Commercial Arbitration Rules & Mediation Procedures, R-7 (Oct. 1, 2013) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.").

In fact, the Services Agreement does not clearly and unmistakably direct that questions of arbitrability be decided by AAA rules; rather, it provides for AAA rules to apply to such arbitrations as may arise under the Agreement.  As

noted, Section 18.A of the Services Agreement carves out certain issues from arbitration, a circumstance that thus delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided. Thus, this case is not akin to those in which we have construed the incorporation of AAA rules into an agreement with a broad arbitration clause to signal the parties' clear and unmistakable intent to submit arbitrability disputes to arbitration. See, e.g., Contec Corp v. Remote Solution Co., 398 F.3d at 208; cf. Zachariou v. Manios, 68 A.D.3d 539, 539, 891 N.Y.S.2d 54, 55 (1st Dep't 2009) (holding that reference to AAA rules in conjunction with narrow arbitration provision does not constitute clear and unmistakable evidence of intent to have arbitrator decide arbitrability).

Accordingly, we conclude that the district court correctly determined that it should resolve the arbitrability of UBS's claims rather than commit that question to an arbitrator.

C.      Arbitrability of UBS's Claims

Insofar as UBS challenges the district court's determination that its claims against NASDAQ are not arbitrable, our review is de novo. See Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002). Two questions are

relevant to determining arbitrability: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir. 2011). Neither UBS nor NASDAQ disputes the validity of their agreement to arbitrate; thus, the sole issue on appeal is whether that agreement reaches UBS's claims.

In deciding that question, we are mindful that federal and state policies favoring arbitration, see CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 669 (2012); Sutherland v. Ernst & Young LLP, 726 F.3d 290, 295 (2d Cir. 2013); Matter of Brady v. Williams Capital Grp., L.P., 14 N.Y.3d 459, 468, 902 N.Y.S.2d 1, 6 (2010) (noting "strong state policy favoring arbitration agreements"), give rise to an "important presumption[]" that "any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration," Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 (2d Cir. 2009) (internal quotation marks omitted). At the same time, however, we recognize the "overarching principle that arbitration is a matter of contract," American Express Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2309 (2013), and that "it is the language of the contract that defines the scope of disputes subject to arbitration," EEOC v. Waffle House, Inc.,

534 U.S. 279, 289 (2002). Thus, parties may be compelled to arbitrate disputes—"but only those disputes"—that they have contracted to submit to arbitration. First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995); see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 684 (2010) (observing that "courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties"); Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002) ("[A]rbitration is a creature of contract, and a person may only be compelled to arbitrate a dispute to the extent that he has agreed to do so."); Matter of Salvano v. Merrill Lynch, Pierce, Fenner & Smith, 85 N.Y.2d 173, 182, 623 N.Y.S.2d 790, 794 (1995) (holding with respect to contractual agreement regarding arbitration, that court's role is "limited to interpretation and enforcement of the terms agreed to by the parties").

In this case, the Services Agreement states the parties' intent to submit all disputes to arbitration "except as provided in the NASDAQ OMX Requirements." Services Agreement, § 18.A, A. 139. The Agreement defines "NASDAQ OMX Requirements" to include NASDAQ rules and rule interpretations. See id. § 1.A., A. 122–23.

The NASDAQ rule pertinent here is Rule 4626, which generally precludes NASDAQ members from seeking compensation for losses attributable to the exchange's handling of securities transactions:

> Except as provided for in paragraph (b) below, Nasdaq and its affiliates shall not be liable for any losses, damages, or other claims arising out of the Nasdaq Market Center or its use. Any losses, damages, or other claims, related to a failure of the Nasdaq Market Center to deliver, display, transmit, execute, compare, submit for clearance and settlement, adjust, retain priority for, or otherwise correctly process an order, Quote/Order, message, or other data entered into, or created by, the Nasdaq Market Center shall be absorbed by the member, or the member sponsoring the customer, that entered the order, Quote/Order, message, or other data into the Nasdaq Market Center.

Rule 4626(a). Because the parties subjected their otherwise broad arbitration agreement to the limitations imposed by NASDAQ rules, we conclude that there could not have been any intent to arbitrate claims precluded by Rule 4626(a).

UBS disputes that its claims against NASDAQ fall within the preclusive language of Rule 4626(a). The argument is defeated by the plain language of the rule, which reaches "any losses, damages, or other claims arising out of the Nasdaq Market Center or its use," except as provided in subparagraph (b). As earlier noted, all of UBS's claims allegedly derive from its use of the purportedly malfunctioning Nasdaq Market Center to participate in the Facebook IPO.

56

Moreover, UBS claims that as a result of NASDAQ's market failures, NASDAQ did not correctly process UBS's Facebook orders in that it did not provide timely notice of confirmation. Rule 4626(a) specifically identifies losses attributable to NASDAQ's failure "correctly [to] process an order" as ones that must be "absorbed" by the exchange member. Thus, we conclude that UBS's claims fall within Rule 4626(a).[14]

UBS nevertheless argues that because Rule 4626 does not explicitly preclude arbitration, a court cannot conclude that the parties did not intend to arbitrate UBS's claims. UBS cites no authority for the proposition that an

_____

[14] UBS argues that arbitration of its gross negligence claims cannot be precluded by Rule 4626(a) because New York does not permit a party to insulate itself from gross negligence by contract. See Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc., 18 N.Y.3d 675, 683, 944 N.Y.S.2d 443, 446 (2012). UBS points to no authority, however, extending this policy to exchange rules promulgated with SEC approval pursuant to federal law. As we observed in Part II.A.2.b, supra, such rules may be contractual in nature, but they differ significantly from general private party contracts in that exchanges and their members are not free to contract out of or around SEC-approved rule requirements or limitations. See 15 U.S.C. § 78cc(a). Indeed, the Services Agreement between NASDAQ and UBS gives effect to this federal statutory requirement by expressly stating that NASDAQ rules take precedence over Agreement provisions in establishing the parties' obligations. See Services Agreement § 17, A. 138. Thus, there is no basis in law to conclude that the broad language of Rule 4626(a) does not apply to gross negligence claims, much less that the parties did—or could have—reached a meeting of the minds to that effect when they agreed that their arbitration obligations would be limited by NASDAQ rules.

affirmative rejection of arbitration is required to demonstrate a lack of intent to arbitrate. In any event, such a requirement is particularly unwarranted here where the agreed limit on arbitration is a rule that precludes not simply arbitration of a claim, but the claim itself. In such circumstances, the question of arbitrability depends on whether the challenged claims do or do not fall within the limiting rule's preclusion. UBS's claims fall within the preclusive language of Rule 4626(a) and, thus, are not arbitrable.

That conclusion finds further support in the single Rule 4626(b) exception relevant here: subsection (b)(3), a provision specifically addressed to Facebook-IPO losses. Proposed by NASDAQ and approved by the SEC in March 2013, Rule 4626(b)(3) establishes "a voluntary accommodation program" for certain member claims arising from the Facebook IPO. SEC Release No. 34-69216, 78 Fed. Reg. at 19,041. Toward that end, it provides a process for claims of injury resulting from "the Nasdaq Halt and Imbalance Cross Process in connection with the initial public offering of Facebook, . . . including any delay in delivering of confirmations of orders." Rule 4626(b)(3). The new subsection prescribes, inter alia, how losses will be measured, the requirements for submitting a claim, the

58

evaluator of the claim, the priority in which claims will be paid, and the maximum total program payment—$62 million. See Rule 4626(b)(3)(A)–(G).

The need to amend Rule 4626—and to secure SEC approval for the amendment—to afford NASDAQ members some compensation for losses incurred in the Facebook IPO reinforces the conclusion that when UBS and NASDAQ agreed to subject the arbitration clause in their Services Agreement to the limitations of Rule 4626(a), they signaled that it was not their intent to arbitrate claims precluded by that rule.

In urging otherwise, UBS emphasizes that participation in the Rule 4626(b)(3) accommodation program is voluntary and that both the SEC and NASDAQ acknowledged that members were free to forego the program and pursue alternative remedies. See SEC Release No. 34-69216, 78 Fed. Reg. at 19,046 ("[A] member is free to elect not to submit a claim for compensation under the accommodation program and choose instead to pursue other remedies."); NASDAQ Ltr. to SEC, Sept. 17, 2012, at 5, A. 337 ("Members that would prefer not to release Nasdaq and instead to attempt to pursue claims against it, notwithstanding the otherwise applicable provisions of Rule 4626 [and other potential defenses], are obviously free to do so."). These statements were issued

in response to certain concerns raised during the rule's public comment period about the program's liability release requirement.  <u>See</u> Rule 4626(b)(3)(H).  These statements do not identify what claims members might alternatively pursue, much less suggest that members can pursue claims foreclosed by Rule 4626(a) except as provided in a 4626(b) exception.

In any event, our concern here is not to identify what, if any, alternative judicial remedies a NASDAQ member might pursue against that exchange in connection with the Facebook IPO.  Nor is it to discern what defenses NASDAQ might raise to such claims.  Our singular purpose is to discern the scope of a broad arbitration provision that is specifically limited by, among other things, NASDAQ rules.  Because Rule 4626(a) specifically disallows member claims against NASDAQ for losses sustained in trading securities on that exchange, we conclude that the parties did not intend to submit such foreclosed claims to binding arbitration.  The only rule exception applicable here—Rule 4626(b)(3)— does not support a different conclusion.  Thus, like the district court, we conclude that UBS's claims against NASDAQ are not subject to arbitration.

Because we thus identify no merit in any of UBS's challenges to the preliminary injunction entered against it in this case, we hereby affirm that injunction.

### III.  Conclusion

To summarize, we conclude as follows:

1.  Federal jurisdiction is properly exercised in this case because, although UBS's challenged arbitration demand against NASDAQ asserts only claims created by state law, (a) the claims necessarily raise actually disputed issues of federal securities law, (b) those issues are of substantial importance to the federal system as a whole, and (c) the exercise of federal jurisdiction in these circumstances will not disrupt any federal-state balance approved by Congress.

2.  The district court properly decided the question of arbitrability because the parties never clearly and unmistakably expressed an intent to submit that question to arbitration, and such an intent cannot be inferred where, as here, a broad arbitration clause contains a carve-out provision that, at least arguably, covers the instant dispute.

3.  UBS's claims against NASDAQ are not subject to arbitration because they fall within the preclusive language of NASDAQ Rule 4626(a), and the

parties specifically agreed that their arbitration agreement was subject to limitations identified in, among other things, NASDAQ Rules.

The order of the district court preliminarily enjoining UBS from pursuing arbitration against NASDAQ is hereby AFFIRMED, and the case is remanded to the district court for such further proceedings as are warranted consistent with this opinion.

STRAUB, *Circuit Judge*, dissenting:

Sixteen billion dollars. Over four hundred million shares. Facebook. The high-profile nature of this case sways the majority's analysis. It is true that the Facebook IPO was front-page news. But it simply cannot be true that every time a case involves a famous company or a multi-billion dollar IPO, federal courts have jurisdiction.

By exercising federal question jurisdiction over state law claims that are premised on the internal rules of a private corporation, the Court extends federal court jurisdiction far beyond its permissible bounds. The majority's expansion of our jurisdiction flies in the face of the dictates of this Circuit and the Supreme Court urging restraint. I therefore respectfully dissent.

## DISCUSSION

This case is about UBS's state law claims against NASDAQ stemming from Facebook's IPO. The majority contends that we have jurisdiction because the state law claims are premised on the contention

that NASDAQ breached its Exchange Act duty to maintain a fair and orderly market by violating its own internal rules. This conclusion runs afoul of nearly every *Grable-Gunn* requirement. There is no actually disputed federal issue, to the extent one exists, it is not "substantial," and exercising jurisdiction disrupts the federal-state balance approved by Congress.

*First*, NASDAQ is a shareholder-owned, publicly-traded, for-profit company. It is not the SEC and its rules are not federal regulations or federal law. In fact, we have explicitly held that the rules of a stock exchange are contractual in nature and within the province of state law. The only arguably federal issue present is a broad duty found in the Exchange Act and that duty is not actually disputed.

*Second*, UBS's state law claims do not present a "substantial" federal question. In drawing the contrary conclusion, the majority ignores or misapplies controlling case law from the Supreme Court and this Circuit. We have held that state law claims premised on violations of the rules of a

-2-

stock exchange do not give rise to a "substantial" federal issue. The majority holding renders our case law incoherent.

Moreover, Supreme Court precedent independently forecloses the exercise of federal jurisdiction. Substantial does not mean "large" or "significant" as the majority suggests. Rather, it means that the issue is important to federal jurisprudence. The Court has repeatedly admonished that federal courts may entertain this "extremely rare exception[]" only in cases that pose a discrete question of law as to the construction or validity of a federal statute or the U.S. Constitution. *See Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013). That kind of issue is not present here.

*Finally*, exercising jurisdiction here would upset Congressional intent as to the balance of federal-state responsibility. I disagree with the majority that Congress's decision to grant federal courts exclusive jurisdiction over Exchange Act violations suggests a similar intent to grant jurisdiction over stock exchange rule violations. In fact, I believe it suggests the opposite.

-3-

The majority's uncabined holding could lead to a "tremendous number of cases" being pulled into federal court—a possibility that should give us pause. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318 (2005). The majority offers no response to this concern other than a conclusory assertion that this shift to federal court will not occur.

For these reasons, I would reverse the decision of the District Court and dismiss the complaint for lack of jurisdiction.

## I.   UBS's state law claims present no actually disputed federal issue.

*Grable* and *Gunn* require a federal issue to be "actually disputed." The majority identifies two different, though related, issues underlying UBS's claims: whether NASDAQ violated its own rules and whether NASDAQ violated its Exchange Act duty to maintain a fair and orderly market. But NASDAQ's rules are not federal and the Exchange Act is not actually in dispute.

### A. NASDAQ's rules are not federal.

The rules at issue—the rules of a stock exchange—are matters of state law. We held as much in *Barbara v. New York Stock Exchange, Inc.*, where we stated: "[T]he rules of a securities exchange are contractual in nature, and are thus interpreted pursuant to ordinary principles of contract law, an area in which the federal courts have no special expertise." 99 F.3d 49, 54-55 (2d Cir. 1996) (internal citation omitted). We then reaffirmed our holding that stock exchange rules are contractual in *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 101 (2d Cir. 2001). The majority does not challenge or reject our holding that the rules of a stock exchange are creatures of state law.

The majority opinion strongly implies that because NASDAQ is subject to heavy federal regulation, its internal rules are sufficiently federal to sustain federal question jurisdiction. *See* Opinion ("Op.") at 23-30. But NASDAQ is a shareholder-owned, publicly-traded, for-profit company. *See* What is NASDAQ? *available at* http://www.nasdaqomx.com/aboutus/

company-information/whatisnasdaq. It is not a federal agency, nor are its rules federal law or federal regulations. Indeed, the primary responsibility for promulgating and enforcing the rules of a stock exchange lies with the stock exchange itself. *See United States v. Solomon*, 509 F.2d 863, 868 (2d Cir. 1975) (quoting *Silver v. New York Stock Exch.*, 373 U.S. 341, 352 (1963)). The federal government acts only as a backstop, bolstering the "exchanges' traditional process of self-regulation." *Id.*; *see also United States v. Stein*, 440 F. Supp. 2d 315, 336 (S.D.N.Y. 2006) ("The stock exchanges had rules and disciplinary mechanisms to enforce them even before the Securities Exchange Act of 1934 brought the industry under federal regulation.").

Moreover, simply because an industry is subject to heavy federal regulation does not elevate it to the status of a government entity, nor are its internal rules elevated to the status of federal law. In *Desiderio v. National Association of Securities Dealers, Inc.*, we considered a case involving the National Association of Securities Dealers (NASD)—the precursor to NASDAQ—and concluded that "the fact that a business entity

-6-

is subject to extensive and detailed state regulation does not convert that organization's actions into those of the state." 191 F.3d 198, 206 (2d Cir. 1999) (quotation marks omitted). We noted further that a self-regulatory organization, like the NASD, "is a private actor, not a state actor. It is a private corporation that receives no federal or state funding. Its creation was not mandated by statute, nor does the government appoint its members or serve on any NASD board or committee." *Id.* We need not exercise this extraordinary type of federal question jurisdiction over state law claims that implicate only the internal rules of a private corporation in a regulated industry.

### B. The Exchange Act is not actually disputed.

The only arguably federal element present in these state law claims—the duty to maintain a fair and orderly market—is not actually in dispute. Unlike in *Grable* (where the parties argued for competing interpretations of a federal statute) or *Gunn* (where one party argued that a patent law exception applied to his lease and the other party argued that it

-7-

did not), no party here disputes the existence, validity, or construction of this Exchange Act duty. *See Gunn*, 133 S. Ct. at 1065-66 ("The federal issue is also 'actually disputed' here—indeed, on the merits, it is the central point of dispute."); *Grable*, 545 U.S. at 315 ("[T]he meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case."). Nor does any party argue that any NASDAQ rule is inconsistent with the Exchange Act.

The majority opinion does not challenge this point. The only actually disputed issues identified by the majority opinion are issues concerning the application of NASDAQ rules to the circumstances of the Facebook IPO. *See* Op. at 24-30. Although the Exchange Act provides the backdrop for applying the NASDAQ rules, the Exchange Act itself is not at issue in this litigation. We are therefore required to decline to exercise federal question jurisdiction over these state law claims.

**II.     UBS's state law claims present no "substantial" federal issue.**

*Grable* and *Gunn* also require the federal issue to be "substantial." But this is exactly the sort of case that we and the Supreme Court have

held does *not* present a sufficiently "substantial" federal question. Our precedent specifically forecloses the majority holding that violations of the rules of a stock exchange present a substantial federal issue. The majority's strained attempt to distinguish those cases is unconvincing.

Moreover, the majority misunderstands, and thus misapplies, the controlling cases from the Supreme Court. Supreme Court precedent permits federal courts to exercise federal question jurisdiction absent a federal cause of action only when the embedded federal issue is a pure question of law as to the construction or validity of a federal statute or the U.S. Constitution. This case presents no such issue. To the contrary, the majority's argument that a "substantial" federal issue exists where a duty from federal law is implicated in a state law claim has been specifically rejected by the Supreme Court.

### A. Our precedent forecloses the exercise of federal question jurisdiction here.

Our own precedent proscribes the exercise of federal question jurisdiction over state law claims arising from alleged violations of the

rules of a stock exchange—even in cases where those rules implicate the core duties of a stock exchange.

*Barbara v. New York Stock Exchange, Inc.* is fatal to the majority's holding. In *Barbara*, we declined to exercise federal question jurisdiction over state law claims arising from alleged violations of the rules of a stock exchange. The facts of *Barbara* are as follows: The SEC initiated an investigation into alleged misconduct by Barbara, a floor clerk at the New York Stock Exchange (NYSE), and his employer, a securities brokerage firm. 99 F.3d at 51. After the SEC filed disciplinary charges against Barbara, the NYSE barred Barbara from working on the floor of the NYSE pending a formal hearing. *Id.* at 52. Despite the eventual reversal of the charges against him, the NYSE Enforcement Division continued to bar Barbara from working on the NYSE floor, causing him to leave the securities industry. *Id.*

Barbara brought numerous state law claims against the NYSE. *Id.* Those claims, we assumed in the opinion, were contingent on proving that

the NYSE violated its own rules.  *Id.* at 54.  Nevertheless, we held that the federal issue presented was "insufficiently substantial" to generate federal question jurisdiction over Barbara's state law claims.  *Id.* at 55.

UBS's state law claims premised on NASDAQ violating its own rules are also insufficiently substantial.  The majority attempts to distinguish *Barbara* by arguing that (1) there is no "separate agreement between the parties . . . that might afford UBS rights distinct from those reflected in NASDAQ's SEC-approved rules"; (2) *Barbara* had no "occasion to consider or discuss the fact that, unlike most contracts between private parties, exchange rules are subject to SEC approval"; and (3) unlike Barbara's claims, UBS's claims "charge NASDAQ with violating the core duty of a federally registered SRO under the Exchange Act."  *See* Op. at 35-39.

I am not persuaded.

### 1. The existence or absence of a separate agreement is irrelevant here.

The majority first argues that *Barbara*'s observation that stock exchange rules are contractual derives from a case in which "this court had to decide which of two agreements controlled an arbitration dispute: the general arbitration provision in the American Stock Exchange's SEC-approved constitution or the parties' more specific customer agreement pertaining to arbitration." Op. at 35 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis*, 903 F.2d 109 (2d Cir. 1990). In our case, the majority notes, there is "no comparable separate agreement between the parties." Op. at 35.

I do not understand how this is relevant. The salient conclusion in *Merrill Lynch* is that we "view[ed] both agreements as contractual." Op. at 35. The presence of the second agreement is irrelevant to the conclusion that the SEC-approved constitution is contractual in nature. Moreover, in *Barbara*, there was no "comparable separate agreement" and yet we had no trouble declining to exercise federal jurisdiction. *Barbara*'s conclusion that

-12-

stock exchange rules are contractual is not the only significant aspect of the decision. Its holding is also important, and *Barbara* held that federal jurisdiction does not extend to state law claims premised on the violation of a stock exchange rule. Those are just the kind of claims that are before us today.

### 2.    *Barbara* **explicitly considered the role of the SEC.**

Far from having no "occasion to consider or discuss the fact that, unlike most contracts between private parties, exchange rules are subject to SEC approval," Op. at 36, the *Barbara* court explicitly acknowledged that the rules of a stock exchange "are subject to SEC approval," and that "the [Exchange] Act requires that these disciplinary proceedings be conducted in compliance both with the Act and with the Exchange's rules and regulations." *Id.* at 51. We noted further that "[n]otice of any final disciplinary sanction imposed by the Exchange must be provided to the SEC, and the imposition of a sanction is subject to review by the SEC on its own motion or at the instance of an aggrieved party." *Id.* (citing 15 U.S.C. §§ 78s(d)(1)-(2)). It is therefore inaccurate to read *Barbara* as failing to

-13-

consider the role of the SEC in approving and enforcing stock exchange

rules.

### 3. Both this case and *Barbara* implicate a core duty of a stock exchange.

Finally, the majority's primary argument is that "the parties' dispute

in *Barbara* did not implicate one of the most fundamental functions of a

national securities exchange."[1]  Op. at 38 (quotation marks omitted).

Indeed, the majority characterizes the dispute in *Barbara* as "trifling."  Op.

at 36.  This contention is inaccurate.  Although the majority attempts to

downplay the importance of the circumstances in *Barbara,* that case

involved one of the most fundamental functions of a stock exchange—the

duty to discipline stock exchange members and associated persons in

order to protect the investing public.  Indeed, the allegations of

---

[1] The majority characterizes a stock exchange's duty to provide for a fair and orderly public stock offering as "the" core duty of a stock exchange.  Op. at 39.  There is no basis for the conclusion that this duty is paramount, or even more significant than any of the other core functions performed by a stock exchange.  Indeed, the SEC Release cited by the majority identifies "the orderly initiation of secondary market trading after an IPO" as only "one of the" core functions of a stock exchange.  *See id.*; *see also* discussion *infra* at 15-18 (noting that the Exchange Act focuses much more particularly on the duty to discipline members than on any duty to administrate a public offering).

misconduct against Barbara were no mere administrative or technical matter. Rather, Barbara and one of his employers—a securities brokerage firm—were alleged to have improperly executed trades for the clients of a different brokerage firm. *See Barbara* Proposed Am. Compl. ¶¶ 9-12.

As an employee of a brokerage firm that was a member of the New York Stock Exchange, Barbara was "of the class of persons whose conduct is regulated by the Exchange pursuant to its duties under the Exchange Act." *Barbara*, 99 F.3d at 54. He was therefore disciplined—pursuant to 15 U.S.C. § 78f(c) and (d)—as a person associated with a member of the New York Stock Exchange. *See Barbara*, 99 F.3d at 51; *see also Barbara v. New York Stock Exch., Inc.,* 94-CV-1088 (ARR), 1995 WL 221487, at *5 (E.D.N.Y. Mar. 30, 1995) (noting that the disciplinary actions taken against Barbara were "clearly authorized by the Securities Exchange Act and by Exchange Rules 35 and 308") (citing 15 U.S.C. § 78f(c) and (d)).

The discipline of national securities exchange members and persons associated with members is a core function of an exchange and is

specifically provided for in the Exchange Act. *See, e.g.*, 15 U.S.C. § 78f(c) and (d). The purpose of such discipline is to protect investors and maintain an orderly market. For example, the Exchange Act provides that a national securities exchange may bar or condition the association of a natural person with a member if that person has engaged "in acts or practices inconsistent with just and equitable principles of trade." 15 U.S.C. § 78f(c)(3)(B)(ii). And an exchange may summarily "limit or prohibit any person with respect to access to services offered by the exchange" if the exchange determines that "such person cannot be permitted to continue to have such access with safety to investors, creditors, members, or the exchange."[2] 15 U.S.C. § 78f(d)(3).

The discipline of members and associated persons is grounded in the duty of a stock exchange to "prevent fraudulent and manipulative acts

---

[2] It appears that the exchange summarily suspended Barbara pursuant to 15 U.S.C. § 78f(c)(3), and an "Acceptability Committee" later determined that Barbara should have been given a disciplinary hearing pursuant to 15 U.S.C. § 78f(c)(1)-(2). *See Barbara*, 1995 WL 221487, at *1, 5 (noting that the stock exchange did not misuse its "Acceptability Hearing and summary suspension procedures").

and practices, to promote just and equitable principles of trade . . . [and] to protect investors and the public interest."  15 U.S.C. § 78f(b)(5).  Therefore, the provisions governing member discipline are equally grounded in the overarching duty to maintain a "fair and orderly market."  15 U.S.C. § 78k-1(a)(1)(C).

Indeed, under the majority's reasoning, *Barbara* is a stronger case for exercising federal jurisdiction than the one before us.  Whereas 15 U.S.C. § 78f—the Exchange Act provision governing national securities exchanges—is silent on any duty specifically concerning the administration of a public offering, the provision specifically and repeatedly provides for the discipline of exchange members and the barring of broker-dealers from membership.  *See* 15 U.S.C. § 78f(c) and (d).

Of the eight requirements that must be satisfied before a securities exchange can be registered, two concern member discipline.  *See* 15 U.S.C. § 78f(b)(6) and (7).  Before the SEC will register a national securities exchange, it must determine that "[t]he rules of the exchange provide that

-17-

. . . members and persons associated with its members shall be appropriately disciplined for violation of the provisions of this chapter, the rules or regulations thereunder, or the rules of the exchange, by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction." *See* 15 U.S.C. § 78f(b)(6); *see also* 15 U.S.C. § 78f(b)(7) (providing that the SEC will register a national securities exchange only if it first determines that the rules of the exchange provide for a fair procedure for disciplining members).

Thus, while the duty to administrate a fair public offering is certainly important, the Exchange Act does not indicate that such a duty is any more important than the general duty of a securities exchange to administrate day-to-day securities trading. And the Exchange Act itself places far more specific emphasis on the duty of a securities exchange to discipline members for unethical or illegal conduct.

There is therefore no distinction between this case and *Barbara*. Both involve state law claims premised upon possible violations of stock exchange rules and both involve rules governing a core function of the stock exchange as set forth in the Exchange Act. The duty to properly manage an IPO and the duty to discipline members and associated persons are both "critical, federally mandated" duties. *See* Op. at 40. But we have held that stock exchange rules implicating such duties are insufficient by themselves to generate federal question jurisdiction.

**4. *D'Alessio v. New York Stock Exchange* does not support the majority's position.**

Nothing in *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93 (2d Cir. 2001) changes our conclusion in *Barbara* that the rules of a stock exchange alone are insufficient to exercise federal jurisdiction. Indeed, in *D'Alessio* we reiterated that the internal rules of a stock exchange should be examined "in accordance with well settled principles of contract interpretation—a task uniquely within the province of state law." 258 F.3d at 101. We did not distinguish *Barbara* from *D'Alessio* on the ground that

-19-

some stock exchange rules give rise to federal question jurisdiction and others do not. We distinguished *Barbara* on the ground that D'Alessio alleged *more* than the violation of stock exchange rules. He alleged that the stock exchange violated the federal securities laws themselves. *See id.* ("In contrast, here, the federal interest is more substantial because D'Alessio's complaint does not simply challenge the propriety of disciplinary proceedings conducted by the NYSE. . . . Rather, an examination of the allegations contained in the complaint establishes that D'Alessio's suit is rooted in violations of federal law . . . ."). No such allegation is made here.

Thus, under *Barbara*, the federal issue is not substantial.

**B.      Supreme Court precedent independently forecloses the exercise of federal question jurisdiction over UBS's state law claims.**

Even without considering *Barbara,* I would reach the same conclusion. The majority opinion misunderstands the meaning of "substantial" in the *Grable-Gunn* context. "Substantial" means, not necessarily "large" or "significant," but important to federal jurisprudence, i.e., the collective body of federal case law. *Grable-Gunn* jurisdiction must

therefore be exercised only over state law claims that implicate a federal

issue that is a pure question of law concerning the validity or construction

of a federal statute or the U.S. Constitution.

Supreme Court precedent also holds that state law claims

incorporating a standard "derive[d] directly from federal law," *see* Op. at

23, as here, are insufficiently substantial to generate federal question

jurisdiction. The majority dismisses this contrary precedent.

> **1.** ***Grable-Gunn* jurisdiction can be exercised only over state law claims that turn on the construction of a federal statute or the U.S. Constitution.**

As the majority opinion acknowledges, the exercise of federal

question jurisdiction in the absence of a federal cause of action is extremely

rare. *See* Op. at 18-19. The Supreme Court has approved of the exercise of

such jurisdiction in only four cases. Those cases, and others where

jurisdiction has been declined, demonstrate that "substantial" in the *Gunn-*

*Grable* context is a term of art. The majority opinion misinterprets

"substantial" to mean "large" or "significant." *See, e.g.*, Op. at 39 (arguing

that this case presents a "substantial" issue because it was "in the context

-21-

of one of the largest public stock offerings in history—involving 421 million shares valued at $16 billion"). In this context, "substantial" means "important to federal jurisprudence."

Supreme Court precedent generally divides issues into two categories. Pure questions of law that involve the *construction* or *validity* of a federal statute or the U.S. Constitution may be substantial enough to warrant federal jurisdiction. Each of the four cases where the Supreme Court approved this kind of jurisdiction shared that key and necessary hallmark:

- *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 310, 315 (2005): Federal question jurisdiction existed where the meaning of a federal tax provision—specifically, what constituted adequate notice pursuant to 26 U.S.C. § 6337(b)(1)— was in dispute. The Court noted that "[t]he meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court" and that this issue of federal law "appears to be the only legal or factual issue contested in the case."

- *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 160, 164 (1997): Federal question jurisdiction existed where plaintiffs claimed that a city ordinance was facially unconstitutional in violation of the Fifth and Fourteenth Amendments.

- *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 201 (1921): Federal question jurisdiction existed because the "decision depends upon the determination" of "the constitutional validity of an act of Congress which is directly drawn in question"—specifically, whether Congress had acted unconstitutionally in issuing certain bonds.

- *Hopkins v. Walker*, 244 U.S. 486, 488-89 (1917): Federal question jurisdiction existed where "the determination of the plaintiffs' rights requires a construction of the [federal] mining laws under which the proceedings resulting in the patent were had, and a decision of what, according to those laws, passed by the patent, and what, if anything, was excepted and remained open to location."

In contrast, the Court has explicitly and repeatedly admonished that federal courts should not exercise federal question jurisdiction over state law claims if the federal issue is not a pure question of law, but is "fact-bound and situation-specific." *Gunn*, 133 S. Ct. at 1068 ("Such fact-bound and situation-specific effects are not sufficient to establish federal arising under jurisdiction.") (quotation marks omitted).

For example, in *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677 (2006), the Court reviewed a reimbursement claim brought by an insurance carrier pursuant to a health care contract authorized by the

Federal Employees Health Benefits Act. The Supreme Court affirmed our

holding that the federal court did not have federal subject matter

jurisdiction. *Id.* at 701. In doing so, the Court distinguished *Grable*, noting

that the federal issue embedded in the reimbursement claim was "fact-

bound and situation-specific," rather than the "nearly pure issue of law"

presented in *Grable*. *Id.* at 700-01. The Court also relied on the fact that the

federal issue in *Grable* was "one that could be settled once and for all and

thereafter would govern numerous tax sale cases." *Id.* at 700.

We have echoed this limitation on the exercise of *Grable-Gunn*

jurisdiction. *See Fracasse v. People's United Bank*, 747 F.3d 141, 145 (2d Cir.

2014) (declining to exercise federal question jurisdiction over state law

claims based on public policy articulated in the FLSA because "[t]he FLSA

needs no interpretation in connection with the state tort claims that have

been pled"); *Congregation Machna Shalva Zichron Zvi Dovid v. U.S. Dep't of

Agric.*, 557 F. App'x 87, 90 (2d Cir. 2014) (declining to exercise federal

question jurisdiction over a state law claim because "the determination at

issue here is a fact-specific application of the regulations to [the plaintiff] that does not implicate the validity of the regulations themselves").

There is no dispute that the arguably federal issue in this case is not a pure question of law, but rather a question of how stock exchange rules should be applied to the unique facts of the Facebook IPO. The majority opinion acknowledges as much. *See* Op. at 24 (noting that the key question here is "how NASDAQ's duty to operate a fair and orderly market . . . applies in the context of an IPO generally, and particularly with respect to the Facebook IPO"). All of the potentially disputed issues identified by the majority involve the application of this duty to the specific context of the Facebook IPO. For example, the majority argues that this litigation may require a court to determine whether NASDAQ should have cancelled certain UBS trades placed during the Facebook IPO pursuant to NASDAQ Rule 11890. *See* Op. at 28. The majority also contends that a court may have to determine whether NASDAQ properly adhered to Rules 4120 and 4753—governing how NASDAQ is required to fill orders, provide

-25-

disclosures, and make decisions regarding initiating, halting, and resuming trading—during the Facebook IPO. *See* Op. at 26-27.

The question of how NASDAQ rules should have been applied to a specific IPO is exactly the sort of "fact-bound and situation-specific" question that the Supreme Court has repeatedly held does not give rise to this rare type of federal question jurisdiction. Not only does this case present only fact-specific legal issues, the legal issues at stake do not involve the construction or validity of a federal statute or the U.S. Constitution. This litigation requires only the application of the rules of a stock exchange, which—notwithstanding the majority's attempt to elevate such rules to federal status—we have repeatedly held are non-federal in nature.

> **2. The incorporation of a federal statutory standard into a state law claim is insufficiently substantial to generate federal question jurisdiction.**

The incorporation into a state law claim of the Exchange Act's general duty to provide a fair and orderly market is insufficiently substantial to trigger federal question jurisdiction.

In *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, the Supreme Court rejected an analogous attempt to generate federal question jurisdiction by incorporating a federal statutory standard into a state law claim. 478 U.S. 804, 814 (1986). There, the Supreme Court examined a product liability claim against a drug manufacturer. As an element of one of their state law claims, plaintiffs alleged that the drug was misbranded in violation of the Federal Food, Drug, and Cosmetic Act, and that this violation created a rebuttable presumption of negligence. *Id.* at 805-06. The Supreme Court concluded that "the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction." *Id.* at 814. In *Grable*, the Court reiterated this conclusion, pointing out that "if the federal labeling standard without a federal cause of action could get a state claim into federal court, *so could any other federal standard without a federal cause of action*." 545 U.S. at 318 (emphasis added).

This case presents an even more tenuous link to the underlying federal standard. The majority opinion argues that a violation of a *stock exchange rule*—which is in turn premised on a duty found in the Exchange Act—will be a required element of UBS's state law claims. *See* Op. at 24-30. In *Merrell Dow*, the federal issue incorporated into the state law claim was an alleged violation of a federal statute itself. *Id.* at 805-06. That federal issue was nevertheless deemed to be insufficiently substantial. *Id.* at 814. The case before us does not present a *more* substantial issue than that in *Merrell Dow*, let alone one sufficiently substantial to generate federal question jurisdiction.

In short, I would conclude that there is no substantial federal question presented under *Barbara*, *Merrell Dow*, and the other Supreme Court precedent in this area.

**III.  Exercise of federal question jurisdiction over UBS's state law claims will upset Congressional intent as to the federal-state balance of responsibility.**

Finally, this case violates the *Grable-Gunn* requirement that the case must be capable of being resolved in a federal court without upsetting the federal-state balance approved by Congress.

The majority's argument that "the exercise of federal jurisdiction here comports with Congress's expressed preference for alleged violations of the Exchange Act, and of the rules and regulations promulgated thereunder to be litigated in a federal forum," is an implausible reading of the Exchange Act.  *See* Op. at 46.  In fact, Congress's conferral of exclusive federal court jurisdiction for violations of the Exchange Act cuts *against* the majority's argument.  Congress understood the distinction between violations of federal law and violations of the rules of a stock exchange, and made a deliberate choice to confer exclusive federal court jurisdiction on claims involving the former and *not* to confer such jurisdiction on claims involving the latter.

Rather, Congress intended that any federal interest implicated in violations of stock exchange rules be vindicated through direct SEC enforcement action. It is curious to suggest that Congress intended that federal interests be vindicated through the indirect means of state law claims that only tangentially implicate federal law.

The majority also fails to adequately address a key concern of this requirement—that permitting traditional state law causes of action, like breach of contract and negligence, into federal court will result in the undesired shift of a "tremendous number of cases" from non-federal forums into federal court. *See Grable*, 545 U.S. at 318.

**A.** **Congress did not intend for state law claims premised solely on violations of the rules of a stock exchange to be litigated in federal court.**

The majority's reliance on the exclusive jurisdiction provision in the Exchange Act as an indication of Congressional intent is unpersuasive. The "Exchange Act" and "the rules and regulations thereunder" do not include or refer to the rules of a stock exchange. Where Congress wished to refer to the rules of a national securities exchange, it specifically referred

to them.  *Compare* 15 U.S.C. § 78aa (providing for exclusive federal court jurisdiction for violations of "violations of this chapter or the rules and regulations thereunder") *with* 15 U.S.C. § 78cc(a) (voiding any provision allowing waiver of compliance "with any provision of this chapter or of any rule or regulation thereunder, or of *any rule of a self-regulatory organization*") (emphasis added); *see also, e.g.*, 15 U.S.C. § 78u(a)(1) (providing that the SEC may investigate whether any person has violated or is violating "any provision of this chapter, the rules or regulations thereunder, *the rules of a national securities exchange* or registered securities association of which such person is a member or a person associated . . . .") (emphasis added).

Based on the plain text of the statute, we have held that the exclusive jurisdiction provision of the Exchange Act does not confer such jurisdiction on claims based on the rules of a stock exchange:  "We think that the quoted language [15 U.S.C. § 78aa] plainly refers to claims created by the Act or by rules promulgated thereunder, but not to claims created

by state law." *Barbara*, 99 F.3d at 55. In so holding, we foreclosed the contrary determinations of the Fifth and Ninth Circuits that the majority oddly chooses to discuss before conceding that "we declined to adopt such a broad reading of § 78aa."[3] *See* Op. at 47.

Despite acknowledging our contrary precedent, the majority "identif[ies] the jurisdiction grant of § 78aa as a signal that we will not upset the appropriate balance of federal and state judicial responsibilities by exercising federal jurisdiction in this case." *See* Op. at 48. In a conclusory fashion, the majority simply extends principles that apply to

---

[3] Other Circuits are in accord with our holding that the exclusive jurisdiction provision of the Exchange Act does not apply to stock exchange rules. *See Karsner v. Lothian*, 532 F.3d 876, 887 (D.C. Cir. 2008) ("Moreover, although the NASD Rules require SEC approval, the Rules do not come within the meaning of 15 U.S.C. § 78aa which gives a federal court 'exclusive jurisdiction of violations' of rules and regulations promulgated under the Securities Exchange Act of 1934.") (internal citation omitted); *Ford v. Hamilton Investments, Inc.*, 29 F.3d 255, 259 (6th Cir. 1994) ("A breach of the NASD rules does not present a question that arises under the laws of the United States within the meaning of 28 U.S.C. § 1331, and it follows *a fortiori* that compliance with NASD rules does not give rise to federal question jurisdiction.") (internal citation omitted). The National Association of Securities Dealers ("NASD") was a self-regulatory organization and precursor to NASDAQ.

federal statutes and regulations to the rules of a stock exchange, without acknowledging that Congress and this Court have found there to be a meaningful distinction between the two. The boundaries of federal jurisdiction are not limitless, and Congress and this Court have drawn that boundary between claims arising from a federal statute or regulation and those arising from the rules of a stock exchange.

Finally, as was made clear in *Merrell Dow* and reiterated in *Grable*, the best expression of Congress's forum preference is found in its decision to create—or, as here, not create—a federal private right of action. *See Merrell Dow*, 478 U.S. at 812 ("The significance of the necessary assumption that there is no federal private cause of action thus cannot be overstated."). *Grable* reaffirmed and clarified this holding, noting that *Merrell Dow* viewed the absence of a federal private right of action as an "important clue" to Congressional intent. *Grable*, 545 U.S. at 318.

Although the Exchange Act provides for several private causes of action for violations of the Act itself, *see, e.g.*, 15 U.S.C. § 78r (providing

private cause of action for misleading statements made in a registration statement), it is undisputed that the Exchange Act does not provide for a private cause of action for violations of stock exchange rules. The majority confronts this problem only by noting that the existence of a federal private right of action is "relevant to, but not dispositive of" the question of substantiality. *See* Op. at 42. But the majority opinion then treats this admittedly "relevant" consideration as irrelevant, because it provides no further explanation as to why this particular case warrants such a ready dismissal of the dictates of *Merrell Dow*.

The Act's legislative history also makes clear that Congress intended that a stock exchange's violations of its own rules be addressed through direct SEC enforcement action—not indirectly through private state law claims. *See, e.g.* S. Rep. 94-75 at 34 (1975) ("Although a wide measure of initiative and responsibility is left with the exchanges, *reserved control is in the Commission* if the exchanges do not meet their responsibility.") (emphasis added). To enforce stock exchange rules, the SEC can "censure

-34-

and place restrictions on the activities, functions, and operations of a self-regulatory agency" or "censure or remove from office any officer or director of a self-regulatory organization who had willfully failed to enforce compliance with the Exchange Act." *Id.* The SEC can also bring a direct injunctive action in federal court to "command a member of a self-regulatory organization to comply with the rules of such organization." *Id.*

Notably absent from the intended enforcement mechanisms are state law actions premised on stock exchange rules. Indeed, no actor other than the SEC—or a similar regulatory agency—is envisioned as playing a role in the enforcement of those rules. There is therefore no basis for the majority's conclusion that the exercise of jurisdiction here aligns with Congressional intent concerning the appropriate forum for state law claims premised on stock exchange rules.

**B.      The majority ignores the "litigation-provoking problem."**

The "balance of federal-state responsibilities" requirement is concerned in large part with upsetting Congressional intent by sweeping a

large number of cases into federal court that are only tangentially related to federal interests.  This concern has been termed the "litigation-provoking problem."  *See Merrell Dow*, 478 U.S. at 809-10.

Any expansion of the exercise of federal question jurisdiction over state law claims must be done with a careful eye to the impact of such a holding on the volume of litigation in the federal courts.  *See Merrell Dow*, 478 U.S. at 811 (expressing concern with the "increased volume of federal litigation" that would result from the exercise of federal question jurisdiction); *Grable*, 545 U.S. at 319 (observing that the Supreme Court declined to exercise federal question jurisdiction in *Merrell Dow* in part because "[a] general rule of exercising federal jurisdiction over state claims resting on federal mislabeling and other statutory violations would thus have heralded a potentially enormous shift of traditionally state cases into federal courts").

Such concerns should be at the forefront here.  In *Grable,* the Supreme Court reviewed the facts in *Merrell Dow* which led to its decision

to decline to exercise federal question jurisdiction: there was no federal private cause of action, the federal question at issue was a federal standard incorporated into a state law claim, and other "garden variety" state law actions could have used the same "embedded" federal issue to bring claims in federal court. *See* 545 U.S. at 318-19. The confluence of these factors led the Supreme Court to conclude that the exercise of federal question jurisdiction over the state law claim in *Merrell Dow* "would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues." *Id.* at 318.

Those same elements are present here. Although the majority gives the potential "horde of original filings and removal cases" no attention, it is a real danger, for three reasons: (1) the duty to maintain a fair and orderly market underlies every stock exchange rule; (2) many other federal statutes create a broad duty; and (3) the majority's opinion will prompt increased litigation even if jurisdiction is ultimately found lacking.

### 1. Federal question jurisdiction could exist for a state law claim implicating any stock exchange rule violation.

First, because the duty to "maint[ain] a fair and orderly market" underlies *every* stock exchange rule, any alleged stock exchange rule violation could provide a basis for removal or original filing in federal court. *See* Op. at 23 ("'[M]aintenance of fair and orderly markets' is the animating goal of federal securities law.") (citing 15 U.S.C. § 78k-1(a)(1)(C)). This is contrary to the Court's reasoning in *Grable*, where the Court observed that "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Grable*, 545 U.S. at 315. Here, in the majority's view, *every* state law claim premised on violations of stock exchange rules "raises a contested matter of federal law."

## 2. The majority's ruling would apply to numerous other federal statutes.

Though the number of potential suits arising from stock exchange rules is problematic enough, the litigation-provoking problem extends far beyond the context of stock exchange rules. To take one example, many state law claims currently arbitrated by the Financial Industry Regulatory Authority (FINRA) could be swept into federal court. The majority provides no limitation on such an outcome.

FINRA is a self-regulatory organization, like NASDAQ, that is registered with the SEC as a "national securities association." Federal law requires most securities firms to register with FINRA. *See* 15 U.S.C. § 78o(b)(11). Like NASDAQ, FINRA creates and enforces rules that govern the securities industry and those rules must be approved by the SEC. *See* 15 U.S.C. § 78s(b)(1). FINRA's rules govern all aspects of securities trading, including, *inter alia*, securities offerings and underwriting, quotation and trading obligations and practices, handling of customer orders, and margin requirements. *See generally* FINRA Rules 4000-5000.

Like NASDAQ's Services Agreement, FINRA rules provide that most disputes be resolved in arbitration. *See* FINRA Rule 12200. Last year, 3,714 arbitration cases were filed with FINRA. *See* FINRA, Dispute Resolution Statistics: Arbitration Cases Filed *available at* http://www.finra.org/ArbitrationAndMediation/FINRADisputeResolution /AdditionalResources/Statistics/. From 1999 to 2013, the number of FINRA arbitration cases filed per year has ranged from a low of 3,238 in 2007 to a high of 8,945 in 2003. *See id.* To put those numbers in perspective, in 2013, 8,574 civil cases were filed in the U.S. District Court for the Southern District of New York. *See* U.S. Courts, U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending March 31, 2013 *available at* http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJud icialCaseloadStatistics/2013/tables/C03Mar13.pdf.

And those are only the cases that could be shifted from FINRA arbitration. As Judge Friendly once observed, "stock exchanges . . . [are]

but one of many instances where government relies on self-policing by private organizations to effectuate the purposes underlying federal regulating statutes." *Cf. United States v. Solomon*, 509 F.2d 863, 869 (2d Cir. 1975). He pointed out that many heavily-regulated industries are responsible for self-regulation, including "boards of trade," which are responsible for self-policing under the Commodity Exchange Act, and "[a]irline and steamship conferences," which employ "elaborate enforcement machinery" to police regulatory violations. *Id.* The potential number of suits that could be filed in, or removed to, the district courts of this Circuit on the basis of the majority's uncabined holding is therefore problematic.

> **3. The majority's opinion will prompt litigation even where federal jurisdiction is ultimately found lacking.**

The majority avers, in conclusory fashion, that the exercise of such jurisdiction will be rare. *See* Op. at 43 ("[A]fter such careful, case-specific consideration, most federal law questions raised in connection with state law claims will not be deemed substantial."). Even if that were true, *Grable*

makes clear that the relevant test is not concerned solely with the eventual decision to exercise or decline jurisdiction, but with the increased volume of litigation itself. *Grable* noted that the Court declined to exercise jurisdiction in *Merrell Dow* in part because it "would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues." 545 U.S. at 318.

The majority's opinion provides no clear jurisdictional limitation to a party with a state law claim based on a violation of a rule even remotely related to federal law. Even if the majority does not significantly move the line where we exercise federal jurisdiction, the majority makes the line murky enough to invite the horde of cases that the Court was concerned about in *Grable* and *Merrell Dow*.

The Supreme Court has indicated that, where federal question jurisdiction would result in a large number of state law claims shifted from other forums to federal court, those state law claims do not fall within the "special and small" category of state law claims over which we can

exercise federal question jurisdiction.  *See Grable*, 545 U.S. at 318; *Merrell Dow*, 478 U.S. at 811.  We should heed the Supreme Court, and recognize that the exercise of *Grable-Gunn* jurisdiction here would upset the balance of federal-state responsibility.

**C.      No federal forum is required to vindicate a federal interest.**

We need not turn somersaults to exercise this exceptional category of federal question jurisdiction, because no federal forum is required to vindicate any federal interest here.  To the extent there is a federal interest at stake, it has already been vindicated by the SEC's investigation and sanction of NASDAQ.  *See* SEC Release No. 31-69655, 2013 WL 2326683 ("SEC Release"). Any tangential federal interest present in UBS's state law claims can be adjudicated in a non-federal forum without doing damage to the federal system.

The Supreme Court has found reason to exercise federal question jurisdiction over the rare category of cases where a state law claim challenges federal agency action and the government "has a direct interest in the availability of a federal forum to vindicate its own administrative

-43-

action." *Grable*, 545 U.S. at 315.  Here, the SEC has already vindicated the government's interest by instituting and concluding its own administrative proceedings.  *See* SEC Release, at *1; *see also* Op. at 8-9.  In a lengthy Release, the SEC found that NASDAQ had failed to comply with several of its own rules, set forth remedial actions to be taken—including the amendment of certain NASDAQ rules—and imposed sanctions.  *See* SEC Release, at *13-17.

In any event, the SEC *always* has a federal forum available if it wishes to pursue litigation concerning the NASDAQ rules.  The Exchange Act specifically provides that the Commission may bring an injunctive action in federal court against any person or entity it believes to be violating the provisions of the Exchange Act, any rules or regulations promulgated thereunder, or "the rules of a national securities exchange." 15 U.S.C. § 78u(d)(1).  Congress therefore intended that any federal interest at issue be vindicated—not through the inefficient and indirect means of a

state law claim based on a violation of a stock exchange rule—but through direct SEC enforcement action.

The Supreme Court has confirmed that federal courts should not exercise federal question jurisdiction over state law claims if those claims can be competently adjudicated in a non-federal forum. In *Gunn*, the Supreme Court rejected the suggestion that a state law malpractice claim premised on a patent law question was entitled to federal court jurisdiction on the basis of federal court expertise: "Nor can we accept the suggestion that the federal courts' greater familiarity with patent law means that legal malpractice cases like this one belong in federal court." 133 S. Ct. at 1068. Likewise in *Empire Healthcare*—where a health insurance carrier for federal employees filed a reimbursement action against the insured's estate—the Court declined to exercise federal question jurisdiction in part because "it is hardly apparent why a proper 'federal-state balance' would place such a nonstatutory issue under the complete governance of federal law, to be declared in a federal forum."

547 U.S. at 701 (internal citation omitted). The Court observed that "[t]he

state court in which the personal-injury suit was lodged is competent to

apply federal law, to the extent it is relevant." *Id.*

Non-federal forums are presumptively competent to adjudicate state

law claims—even those that tangentially concern federal law.[4] *See Gunn*,

133 S. Ct. at 1067; *Empire Healthcare*, 547 U.S. at 701. The state law claims at

issue, while perhaps complicated and potentially worth a great deal of

money, are not unlike any number of other complex contract and

negligence claims competently adjudicated in state court or arbitration

forums.

Finally, the majority opinion appeals to the need for "uniformity" in

the adjudication of "an exchange's performance of specified Exchange

duties." Op. at 48. As noted above, no provision of the Exchange Act

---

[4] Indeed, state courts are presumed competent to adjudicate any *federal* cause of action that has not been exclusively diverted to federal court. *See Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990) ("Under our system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.") (quotation marks omitted).

requires interpretation or application here. And to the extent that the

Exchange Act is implicated in a state law claim, the most efficient and

direct way for the federal courts to ensure uniformity of federal law is to

interpret or construe any federal law dispute in the context of a direct SEC

enforcement action.

"[A]llowing state courts to resolve these cases" will not "undermine

the development of a uniform body of [securities] law." *Cf. Gunn*, 133 S.

Ct. at 1067. Congress has already ensured a uniform body of securities

laws "by vesting exclusive jurisdiction over actual [securities] cases in the

federal district courts." *Cf. id.*

Uniformity will also remain undisturbed because federal courts

have exclusive jurisdiction over cases involving actual violations of the

Exchange Act. And the adjudication of this case by an arbitration panel or

state court will be non-binding on federal courts. *See id.*; *Tafflin v. Levitt*,

493 U.S. 455, 465 (1990) (rejecting the argument that state courts should not

adjudicate civil RICO claims because "federal courts . . . would retain full

-47-

authority and responsibility for the interpretation and application of federal criminal law, for they would not be bound by state court interpretations of the federal offenses constituting RICO's predicate acts"). There is no special need for a federal court to resolve these state law claims.

## CONCLUSION

The majority opinion expands our jurisdiction beyond its permissible bounds. In doing so, it ignores or misreads controlling precedent from the Supreme Court and this Circuit. I dissent.